[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 02, 2002
THOMAS K. KAHN
CLERK

No. 00-10554

D. C. Docket No. 98-01063-CV-D-S

BRADLEY MILLER,

Plaintiff-Appellee,

versus

KENWORTH OF DOTHAN INC., a Corporation,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Alabama

**(January 2, 2002)**

Before TJOFLAT and BIRCH, Circuit Judges, and VINING\*, District Judge.

_____

\* Honorable Robert L. Vining, U.S. District Judge for the Northern District of Georgia, sitting by designation.

TJOFLAT, Circuit Judge:

The appeal in this Title VII case presents two issues: (1) whether the plaintiff made out a hostile work environment claim sufficient for the jury, and (2) whether the evidence showed that the employer acted with actual malice or reckless indifference to the plaintiff's federally protected rights. We resolve the first issue in favor of the plaintiff, and the second in favor of the employer.

## I.

### A.

The employer is Kenworth of Dothan, Inc. ("Kenworth"). Its owner and president is Robert Mitchell, who also owns and manages Kenworth of Birmingham, Inc. Both companies are tractor-trailer dealerships. They are supervised by the following officers, stationed in Birmingham: Andy Thurmond, Director of Operations; Jeff Weaver, Director of Parts and Services; and Laura Box, Sales Manager. Weaver and Box alternately travel from Birmingham to Dothan to supervise the dealership there. The only managers located in Dothan on a permanent basis are Tommy Davenport, manager of the Parts Department, and David Brooks, manager of the Service Department. Both of these managers report directly to Weaver.

Bradley Miller, a Mexican-American, was employed in Dothan's Parts

2

Department as the back counter parts salesman from September to December 22, 1997, when Mitchell fired him. During that time his job duties consisted of distributing parts to the service technicians in the Service Department. The Service Department consisted of eight technicians and one shop foreman, Randy Galpin, who was hired in November 1997.

Shortly after Miller came to work in September, his coworkers in the two departments gave him several nicknames, principally "Julio," "Chico," and "Taco." Miller did not complain about his coworkers' use of these nicknames until Galpin came to work, and started calling him "Wetback," "Spic," and "Mexican Mother F-----." He told Brooks, Galpin's direct supervisor, "to tell [Galpin] . . . to watch what he says to me." Brooks knew what Galpin was doing; his office was located in the shop, where much of the name-calling occurred, and on some occasions he was actually present. Although he had the authority and responsibility to intervene, Brooks did nothing; he neither disciplined Galpin nor reported the matter to Weaver.

When, during a visit to the Dothan location, Box overheard another employee refer to Miller as "Julio" or "Taco," she immediately reported the incident to Weaver, who, in turn, reported the problem to Mitchell. In response, Mitchell instructed Thurmond to review the company's anti-discrimination

policies[1] with the employees in Dothan at the November safety meeting, to be held the following week.

Brooks, Galpin, and Miller were among those present at that meeting. Focusing on the use of ethnic slurs, Thurmond warned the employees that anyone using such slurs would be terminated immediately, and instructed them to report any such incidents. After the meeting, Miller's coworkers stopped using the derogatory nicknames, except for Galpin. Thurmond's warning notwithstanding, he persisted in calling Miller "Wetback," "Spic," or "Mexican Mother F-----" until Miller was fired, on December 22, 1997.

## B.

After filing a complaint with the Equal Employment Opportunity Commission and obtaining a right to sue letter, Miller brought this suit against Kenworth, under 42 U.S.C. § 2000(e)(1)-(17), and 42 U.S.C. § 1981. Claiming that Kenworth had subjected him to an ethnically hostile work environment and

---

[1] Kenworth had two written discrimination policies: a "Sexual Harassment Policy" and a "Work Place Conduct Policy." The latter policy states:

> All employees of this Company are to conduct themselves in a professional, mature manner and be polite and cordial to all customers, vendors, and other employees. The following is a list of behaviors that will not be tolerated. The list includes but is not limited to the use of profanity, vulgar language, fighting, discriminatory remarks or name calling.

The policy contained no reference to discrimination or harassment based on national origin.

had retaliated against him for complaining about it, Miller sought legal relief in the form of compensatory and punitive damages and equitable relief. Answering Miller's complaint, Kenworth denied (1) that Miller had been subjected to ethnic discrimination sufficient to create a hostile work environment; (2) that, even assuming a hostile work environment, it had notice thereof; and (3) that it terminated Miller's employment for discriminatory reasons. It terminated his employment, Kenworth asserted, because of his poor work performance and his "vengeful attitude towards management."

The case proceeded to trial on Miller's claims. At the close of the plaintiff's evidence, Kenworth made an oral motion for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. The court did not rule on the motion, and, at the close of all of the evidence, Kenworth moved once again for judgment as a matter of law pursuant to Rule 50(a). The court reserved ruling on the motion and submitted the case to the jury under special interrogatories.[2] The jury found against Miller on his retaliatory discharge claim, but found for him on his hostile environment claim, awarding him $25,000 in compensatory damages.[3]

---

[2] Because the sole question before us is whether the district court erred in denying Kenworth's motion for judgment as a matter of law made at the close of all the evidence, the interrogatories the court submitted to the jury are irrelevant for purposes of this appeal.

[3] The district court treated the jury's finding on the retaliatory termination claim as dispositive of Miller's claim for equitable relief. Miller does not cross-appeal the denial of

5

The jury also found that Kenworth had acted with malice and reckless indifference in creating the ethnically hostile work environment and therefore awarded Miller $50,000 in punitive damages.

The district court thereafter addressed Kenworth's Rule 50(a) motion for judgment as a matter of law and denied it.[4] Kenworth now appeals.

## II.

We review a district court's denial of a motion for judgment as a matter of law de novo. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999). We therefore "review all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the non-moving party." Walker v. NationsBank of Florida, N.A., 53 F.3d 1548, 1555 (11th Cir. 1995).[5] We will

---

equitable relief.

[4] The district court's judgment was entered pursuant to the jury's verdict on December 29, 1999. On January 12, 2000, Kenworth served a Rule 50(b) motion for judgment as a matter of law and an alternative motion for a new trial. The motion was not filed, however, until the next day, January 13. The Rule 50(b) motion was unnecessary because the district court had reserved ruling on Kenworth's Rule 50(a) motion until after the jury returned its verdict. The alternative motion for new trial, though, was untimely. Rule 59(b) requires that "[a]ny motion for a new trial shall be filed no later than 10 days after entry of the judgment." (Emphasis added). Since the judgment was entered on Wednesday, December 29, 1999, the 10-day period expired on Wednesday, January 12, 2000 (taking into account the Saturdays, Sundays, and legal holidays that were not counted pursuant to Fed. R. Civ. P. 6(a)). On January 18, 2000, the court denied Kenworth's alternative post-trial motions and denied Kenworth's Rule 50(a) motion made at the close of all the evidence.

[5] We have taken the evidence in the light most favorable to Miller in setting out the facts in part I.A.

uphold the district court's denial if we determine that "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." Id. We will reverse that denial only if we conclude that "the facts and inferences point overwhelmingly in favor of [the moving party], such that reasonable people could not arrive at a contrary verdict." Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997) (citation omitted).

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 1126 L. Ed. 2d 295 (1993). This court has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the

7

harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. See, e.g., Mendoza, 195 F.3d at 1245 (applying these factors in the context of a hostile environment sexual harassment claim). Kenworth does not dispute that Miller belongs to a protected group (Mexican-Americans), or that the offensive comments were based on Miller's national origin and were unwelcome. Rather, Kenworth asserts that Miller failed to present substantial evidence to support findings in his favor on the fourth and fifth elements. We consider these elements in turn.

## A.

Kenworth contends that Miller failed to present substantial evidence that the harassing conduct of Galpin was sufficiently severe or pervasive to alter the terms or conditions of his employment. This requirement, as defined by the Supreme Court, contains both an objective and a subjective component. See Harris, 510 U.S. at 21-22, 114 S. Ct. 367, 370-71. Thus, to be actionable, this behavior must result in both an environment "that a reasonable person would find hostile or abusive" and an environment that the victim "subjectively perceive[s] . . . to be abusive." Id. Kenworth argues that Miller failed to carry his burden with respect

8

to both criteria, and, as such, the district court erred in refusing to grant its motion for judgment as a matter of law.

In evaluating the objective severity of the harassment, we consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris, 510 U.S. at 23, 114 S. Ct. at 371). Kenworth argues that in failing to show how Galpin's conduct unreasonably interfered with his work performance, Miller necessarily failed to satisfy the objectiveness prong of the Allen test. In focusing on this single factor of the Allen analysis, Kenworth loses sight of the totality of the circumstances approach which we have adopted. See, e.g., Mendoza, 195 F.3d at 1246. Employing this approach, and considering all of the evidence in the light most favorable to Miller, we conclude that fair-minded jurors could have reasonably concluded that Miller suffered severe and pervasive harassment sufficient to alter the terms or conditions of his employment.

First, there was sufficient evidence presented at trial to establish that Galpin's conduct was frequent. Miller and others testified that Galpin's name-calling permeated the Dothan facility–he hurled the ethnic slurs at Miller three to

9

four times a day. Miller's duties required him to go into the service area and interact with Galpin on a daily basis, which means he was unavoidably exposed to the harassing comments throughout the approximately one month period the two men were both employed at Kenworth. As the Seventh Circuit has held, it is "repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment" and not simply some "magic number" of racial or ethnic insults. See Shanoff v. Illinois Dep't of Human Servs., 258 F.3d 696, 704 (7th Cir. 2001). Certainly, the conduct at issue here was as frequent as conduct we have previously held to be sufficient to constitute an objectively hostile work environment. See Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 509 (11th Cir. 2000).[6] Second, a reasonable jury could have considered Galpin's conduct to be severe. The Supreme Court has instructed that Title VII is only implicated in the case of a workplace that is "permeated with discriminatory intimidation, ridicule and insult," not where there is the "mere utterance of an . . . epithet." Harris, 510 U.S. at 21, 114 S. Ct. at 370 (citation omitted). Miller did not suffer from overhearing occasional off-color comments. Rather, as one of his coworkers testified, Galpin

---

[6] In Johnson, we concluded that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent, and distinguishable from Mendoza "where there were fewer instances of less objectionable conduct over longer periods of time." Johnson, 234 F.3d at 509.

10

and other technicians in the Service Department used the derogatory names in an intimidating manner, shouting them at Miller during the course of berating him for his job performance, or when they were "arguing with him," were "mad with him," or were "taunting him." This conduct rose above the level of off-handed comments in the course of casual conversation that the Supreme Court has refused to find actionable. See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998). Third, the testimony makes it clear that these incidents were humiliating and degrading to Miller. The very nature of the coworkers' utterances, coupled with the fact that they were directed at Miller and were sometimes used in the course of reprimanding him in front of others, establishes this factor. Finally, there was evidence that Galpin's behavior prevented Miller from performing his job, on at least one occasion. Kenworth emphasizes testimony that Miller engaged in horse play at work, used his time to make personal phone calls, and was often seen loafing with other employees, and suggests these as alternative reasons for Miller's poor job performance. Even if true, this would not prevent the jury from reasonably finding that Galpin's conduct also interfered with Miller's job performance. The Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable. See Harris, 510 U.S. at 22,

11

114 S. Ct. at 371. Thus, having established the frequency, severity, and humiliating nature of the conduct, Miller's failure to establish convincingly how Galpin's conduct interfered with his duties is not fatal to his hostile environment claim, given the totality of the circumstances. We therefore cannot conclude that the jury unreasonably found Galpin's conduct to be sufficiently severe and pervasive such that the terms or conditions of Miller's employment were altered.

Kenworth also argues that Miller failed to establish his subjective belief that Galpin's conduct was abusive. Miller testified that he told Galpin "no, don't say it any more," or "I am tired of hearing that." It bothered him enough that, prior to his termination, he informed coworkers that he had consulted a lawyer regarding Galpin's harassment. Kenworth points us instead to Miller's failure to address any complaints about Galpin's conduct to Davenport, his immediate supervisor, and to provide Brooks with sufficient details of Galpin's behavior at the time he asked Brooks "to tell [Galpin] he needs to watch what he says to me." Kenworth suggests that these failures, coupled with Miller's having heard Thurmond's statement at the November safety meeting that employees making ethnic slurs were to be reported to management, and having witnessed Box reprimand a coworker who addressed Miller as "Taco" and "Julio," demonstrate that Miller did not subjectively believe that Galpin's conduct was abusive or discriminatory. We

12

cannot agree that these facts, while relevant, would prevent a reasonable jury from finding that Miller subjectively perceived Galpin's conduct as abusive. Miller did ask Galpin's own supervisor, Brooks, to tell Galpin to "watch what he [said] to [him]." Moreover, Miller knew that Brooks was present when Galpin used the epithets, yet did nothing, and he knew that Galpin had been undeterred by the warnings given by Thurmond at the November safety meeting. In the face of these experiences, we cannot conclude that Miller's failure to report Galpin's subsequent conduct is dispositive.

B.

Kenworth contends that Miller failed to establish the fifth element of a hostile work environment claim – that, as the employer, it is responsible for the hostile work environment under either a theory of vicarious or direct liability. An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998). The employer will be strictly liable for the hostile environment if the supervisor takes tangible employment action against the victim. See id. at 807, 118 S. Ct. 2293. However, when an employee has established a claim for vicarious liability but where no tangible employment action was taken, a defending employer may

13

raise as an affirmative defense to liability or damages: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807, 118 S. Ct. at 2292-93. Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action. See Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000). Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer. See id.

If Miller made out a case for the jury on either of these theories, the district court ruled correctly when it denied Kenworth's Rule 50(b) motion for judgment as a matter of law. Since we conclude that Miller presented evidence sufficient to establish that Kenworth had constructive knowledge of coworker harassment, and that Kenworth failed to take remedial action, we need not consider whether Miller established a case of vicarious liability.

Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it. Miller contends that his comment to Brooks "to tell [Galpin] he needs to watch what he

14

says to me" was sufficient to give Kenworth actual notice of the harassment. We have held that merely showing a supervising manager a sexually suggestive note, received by an employee from a coworker, did not adequately apprize the manager of "the dimensions of the problem or even that there *was* a problem that required his attention," and therefore did not rise to the level of "actual notice" to the employer necessary to impose liability under Title VII. See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1365 (11th Cir. 1999). Miller's generalized comment to Brooks would similarly not constitute actual notice for which we would impose direct liability.

Unfortunately for Kenworth, this was not the only notice Brooks received. There is ample evidence in the record establishing that Brooks had constructive knowledge of Galpin's abusive comments. We have held the following factors to be germane to the issue of constructive notice of harassment: "(1) the remoteness of the location of the harassment as compared to the location of management; (2) whether the harassment occurs intermittently over a long period of time; (3) whether the victims were employed on a part-time or full-time basis; and (4) whether there were only a few, discrete instances of harassment." Allen v. Tyson Foods, Inc., 121 F.3d 642, 647 (11th Cir. 1997). Brooks' office was located in the Service Department shop, where much of Miller's abuse occurred. Viewed in the

15

light most favorable to Miller, the evidence presented at trial established that Brooks was actually present at times when Galpin shouted the ethnic insults at Miller. The abuse occurred on a daily basis for the month that Galpin and Miller were both full-time employees of Kenworth. Finally, Galpin's harassment of Miller occurred up to three to four times a day, and was often directed at Miller in the presence of others. Considering the relevant factors, we find that the evidence set forth in the record, viewed in the light most favorable to Miller, was sufficient to support a jury finding of constructive notice on the part of Kenworth.

Even if we find Brooks had constructive knowledge of the abuse of Miller, Kenworth argues that this cannot constitute notice to Kenworth, since Brooks is not a part of Kenworth's "higher management," which it claims includes only Mitchell, "arguably" Thurmond and Weaver, and "possibly" Box. The district court disagreed, and concluded that as one of only two managerial employees permanently assigned to Kenworth, Brooks constituted part of that company's "higher management." In Dudley v. Wal-Mart Stores, Inc., we held that actual notice of racial discrimination to two Wal-Mart store managers could not serve as notice to the corporation because they were not sufficiently high up the corporate ladder. Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1323 (11th Cir. 1999). Kenworth is not similarly situated to the defendant in Dudley to justify the

16

application of that holding to the present facts. Rather than a corporate giant where employees are separated from higher management by many intermediate-level managers, Brooks was separated from Mitchell, president and owner of Kenworth, by only one person -- Weaver. This organizational structure, in conjunction with the fact that Brooks was one of only two managers on-site at Dothan, would allow a reasonable jury to conclude that Brooks was of a sufficiently high level in the company such that notice to him of the hostile work environment would serve as notice to Kenworth.

Kenworth further argues that its "valid, effective and disseminated policy prohibiting harassment" precludes it from being charged with constructive notice. We have held that "[w]here there is no policy, or where there is an ineffective or incomplete policy, the employer remains liable for conduct that is so severe and pervasive as to confer constructive knowledge," but when an employer has "promulgated an effective and comprehensive" anti-harassment policy that is "aggressively and thoroughly disseminated" to its employees, an employee's failure to utilize the policy's grievance process will prevent constructive knowledge of such harassment from adhering to the employer. See Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997). We cannot find Kenworth's Work Place Conduct Policy to be either comprehensive or effective. It

17

was certainly not aggressively or thoroughly disseminated. Despite Kenworth's claims of its policy's effectiveness, no member of the management hierarchy was familiar with it, it was not posted in the workplace, and it was inexplicably missing from Miller's personnel file.[7] Furthermore, a policy must be found ineffective when company practice indicates a tolerance towards harassment or discrimination. Despite the presentation given to the Dothan employees by Thurmond at the November safety meeting, Galpin's abusive treatment of Miller continued without any intervention by Brooks, indicating acceptance and tolerance of the behavior. We cannot therefore conclude that the mere existence of Kenworth's general anti-discrimination policy would prevent a reasonable jury from charging Kenworth with constructive notice of Galpin's harassment of Miller.

In light of the constructive notice Kenworth had of the hostile work environment suffered by Miller, the jury could reasonably have found it directly liable to Miller if it concluded that Kenworth failed to take immediate and appropriate corrective action. There is absolutely no evidence in the record to indicate that Kenworth took any action whatsoever against Galpin, let alone that which would rise to the level of appropriate and immediate. See Fleming v.

---

[7] Kenworth's practice was to present newly hired employees with copies of the two discrimination policies and then sign written acknowledgments of receipt, which were placed in the employees' personnel files.

18

<u>Boeing Co.</u>, 120 F.3d 242, 247 (11th Cir. 1997). It was thus reasonable for the jury to conclude that Kenworth was directly liable for the hostile work environment it should reasonably have known of, yet failed to remedy.

C.

Finally, Kenworth asks this court to hold erroneous the district court's submission of the punitive damages issue to the jury. The Supreme Court has directed that, for the issue of punitive damages to reach the jury in a section 1981 case, the plaintiff must come forward with substantial evidence that the employer acted with actual malice or reckless indifference to his federally protected rights. <u>See</u> <u>Kolstad v. Am. Dental Ass'n.</u>, 527 U.S. 526, 536-37, 119 S. Ct. 2118, 2125-26, 144 L. Ed. 2d 494 (1999). Malice or reckless indifference is established by a showing that the employer discriminated in the face of the knowledge that its actions would violate federal law. <u>See id.</u> at 536, 119 S. Ct. at 2125. We have held that "punitive damages will ordinarily not be assessed against employers with only constructive knowledge" of harassment; rather, punitive damages may only be considered in cases where the "discriminating employee was high[] up the corporate hierarchy" or where "higher management countenanced or approved [his] behavior." <u>Dudley v. Wal-Mart Stores, Inc.</u>, 166 F.3d 1317, 1323 (11th Cir. 1999) (internal citations omitted). Finally, the Supreme Court has held that

19

employers may assert a good faith defense to vicarious liability for punitive damages where the "employment decisions of managerial agents . . . are contrary to the employer's 'good-faith efforts to comply with Title VII.'" Kolstad, 527 U.S. at 545, 119 S. Ct. at 2129.

As discussed in part B, supra, Kenworth did not have actual notice. Even viewing the evidence in the light most favorable to Miller, we do not find sufficient evidence on the record to support the necessary finding of malice or reckless indifference by Kenworth for the federal rights of Miller to justify the award of punitive damages.

III.

Kenworth has not demonstrated that a reasonable jury could not find it directly liable for the hostile work environment suffered by Miller. The appeal from the district court's denial of Kenworth's motion for a judgment as a matter of law is therefore DENIED. However, the assessment against Kenworth of punitive damages is contrary to the law as articulated by the Supreme Court and this circuit, and the district court's denial of Kenworth's motion for judgment as a matter of law on this issue is therefore REVERSED and the award of punitive damages to Miller is VACATED.

SO ORDERED.