[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15202
Non-Argument Calendar
_____

D.C. Docket No. 2:11-cv-00713-WHA-CSC


BEASLEY SINGLETON,

                                                            Plaintiff - Appellant,


versus


AUBURN UNIVERSITY MONTGOMERY,
KATHERINE JACKSON,

                                                            Defendants - Appellees.


_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(May 30, 2013)

Before HULL, MARTIN and JORDAN, Circuit Judges.

PER CURIAM:

Beasley Singleton is a former employee of Auburn University Montgomery (Auburn).  He sued Auburn alleging, among other things, a hostile work environment and race discrimination in violation of Title VII.  The district court granted summary judgment in favor of Auburn, finding that the derogatory race-based comments at Auburn were too infrequent to create a hostile work environment.  The district court also held that Singleton's circumstantial evidence of race discrimination failed to show a genuine dispute about whether he was replaced by a white employee or whether he lost a promotion because of his race. Singleton argues on appeal that he established a prima facie case of a hostile work environment and racial discrimination.

We review the district court's grant of a summary judgment motion de novo, applying the same legal standard as the district court.  See Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003).  Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (quotation marks omitted).  In deciding whether there is a genuine issue as to any material fact, we "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant."

2

Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citation omitted). "A genuine issue of material fact exists when a reasonable jury could return a verdict for the nonmoving party." Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1254 (11th Cir. 2012) (quotation marks omitted).

## I.

At the summary judgment stage, "we must accept [Singleton's] version of the facts as true."[1] Kingsland v. City of Miami, 382 F.3d 1220, 1227 (11th Cir. 2004). Singleton began working for Auburn in 1991 as a maintenance technician. He became a lead technician two years later, and was then promoted to maintenance facilities manager. Sometime during his employment, approximately four to five years before he sued Auburn, he attended a meeting that was only for supervisors. He was asked to leave because he was not a supervisor. Dale Caldwell, a former employee in Human Resources, called Singleton a "Do Boy" because he was performing supervisory duties although he was not a supervisor. Darrell Morris, Singleton's supervisor, said "[m]an, don't say that."

---

[1] Before granting summary judgment in favor of Auburn, the district court struck some of the evidence presented by Singleton. In his appellate brief, Singleton relies on some of this stricken evidence in advancing his arguments. However, Singleton has failed to present substantive argument, legal authority, or relevant facts to challenge the district court's decision to strike the evidence, so this argument is waived. Old W. Annuity & Life Ins. Co. v. Apollo Grp., 605 F.3d 856, 860 n.1 (11th Cir. 2010). We will not consider the evidence struck by the district court.

Singleton said this was the only time he was called a "Do Boy" at Auburn. Although Singleton had a tense professional relationship with his supervisor Morris,[2] Singleton could not remember Morris using any derogatory terms. However, Debra Foster, a former employee in Human Resources, said that she once told Singleton to tell Morris that the term "Do Boy" or "Boy" is "inappropriate," suggesting that Morris may have used the term as well.

Although not directed at him, Singleton was aware of other instances of racist behavior affecting other black employees at Auburn. He knew that Carrie Martin, a black Auburn employee, had been referred to by a racial epithet (specifically, "n_____"). He was aware that Dr. Katherine Jackson treated white employees better than black female employees. He also knew that Morris treated Judith Hagan, a white employee, more favorably than two black employees, Louvenia McCray and Carrie Martin. Singleton also knew that Adrianne Giles, a black employee, was discriminated against by being forced to use a time clock. A rumor circulated that Wanda Blake, a white Auburn supervisor, said that a black employee didn't deserve to make $95,000. Singleton said he could not remember

_____

[2] When Morris began work at Auburn, he worked for Singleton. Morris then became Singleton's supervisor. There was tension when Morris became his supervisor because Singleton disagreed with how Morris told him to handle everyday tasks. Singleton was told that Morris made a comment that he would "take care of Beasley's ass" once he was promoted. Singleton confronted Morris about the comment, and Morris explained it was in response to coworkers' complaints about Singleton's attitude and approach towards the job. Morris denied it was "a racial thing."

Blake making any other racially derogatory comments.[3]  Four Auburn employees filed EEOC charges against Auburn, and three of these four also sued Auburn.

Finally, Glenn Allen, Singleton's former supervisor, told Singleton "it's sad because of your color you need to . . . watch your back."  Allen said this because he once gave Singleton a positive performance evaluation, and the Director of Housing and Residence Life, Kevin Shout asked Allen why he gave Singleton such a good review.  Allen said Singleton was "one of the best we'll ever have," and Shout said "[w]e [have] got to find a way to stop him from being the best we have."

On August 26, 2010, Singleton was informed that his position was being outsourced.  He was put on lay-off status for 180 calendar days.  On October 6, 2010, Singleton resigned with the understanding that he would no longer be on lay-off status.

## II.

Title VII prohibits a hostile work environment where repeated conduct, "such as discriminatory intimidation, ridicule, and insult" collectively creates "one unlawful employment practice."  McCann v. Tillman, 526 F.3d 1370, 1378 (11th

---

[3] However, on a separate occasion, Singleton asked Blake if she had hired Dorsey Smith, a new black employee, and she said "[d]on't be ridiculous."  Singleton didn't know what Blake meant by this comment, or if it related to Smith's qualifications, but Singleton explained that it sounded derogatory.

Cir. 2008) (quotation marks omitted). "Thus, these claims are based on the cumulative effect of individual acts." Id. (quotation marks omitted).

To establish a hostile work environment claim, Singleton must show that: 1) he belongs to a protected group; 2) he was subject to harassment; 3) that harassment was based on a protected characteristic; 4) the "harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and 5) Auburn is responsible for the hostile environment under either a theory of direct or vicarious liability. Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009) (quotation marks omitted).

Singleton has established the first three elements of a hostile work environment claim. The issue before us is limited to whether the harassment was sufficiently severe or pervasive to create an abusive work environment. Singleton argues the harassment that he experienced was sufficiently severe and pervasive because during his time at Auburn he was called "Do Boy"; he was asked to leave a meeting of supervisors; he was told to "watch [his] back" because of his race; and Morris said he would "take care of Beasley's ass." He also stresses that he was aware of the harassment and derogatory comments directed towards other black employees. Auburn responds that much of the conduct that Singleton points

6

to is race-neutral, and the remaining behavior is not severe or pervasive enough to establish a prima facie case of a hostile work environment.

Viewing the facts in the light most favorable to Singleton, Rioux, 520 F.3d at 1274, we conclude that the racist comments and conduct at Auburn were not sufficiently severe or pervasive.  In considering whether the harassment was sufficiently severe or pervasive, we require that the environment be both objectively and subjectively abusive.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002).  We look at all the circumstances to determine whether an environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993).

On one occasion an Auburn supervisor called Singleton a "Do Boy."  He was immediately admonished.  We will consider that Morris also called Singleton a "Do Boy" or "Boy" causing Foster to advise Singleton to confront Morris.  At the summary judgment stage, we will also accept that Shout's questioning of Singleton's performance review was racially motivated.  These were the only racist comments or conduct directed against Singleton in his nearly twenty years at

7

Auburn.[4]  Singleton also knew that a black employee at Auburn was referred to by an offensive racial epithet, and it was rumored that a white Auburn supervisor said that a black employee didn't deserve to make $95,000.[5]

"Although offensive, such instances of racially derogatory language alone, extending over a period of . . . years, are too sporadic and isolated to establish that [Auburn's] conduct was so objectively severe or pervasive as to alter the terms and conditions of [Singleton's] employment." McCann, 526 F.3d at 1379.  In McCann, we concluded that a white employee calling a black female employee "girl" and two black male employees "boys," and another white employee calling a different black employee a "n____ bitch" over a period of less than three years did not rise to the level of severe or pervasive harassment. Id. at 1378–79.  We similarly conclude here that the racist slurs at Auburn, while deplorable, were not severe or pervasive enough to create a hostile work environment. See Miller, 277 F.3d at

---

[4] Singleton acknowledges that he was asked to leave the meeting of supervisors because he was not a supervisor.  Blake's statement that she didn't personally hire a new black employee and Morris's comment that he would "take care of Beasley's ass," appear to be race-neutral.  Even if these comments were related to Singleton's race, the cumulative effect was not sufficiently severe or pervasive. Cf. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (explaining that title VII protection is implicated only when "'the workplace is permeated with discriminatory intimidation, ridicule, and insult'").

[5] The remainder of Singleton's allegations concern "patterns of discrimination practiced against black employees, which constitute discrete acts that must be challenged as separate statutory discrimination and retaliation claims." McCann v. Tillman, 526 F.3d 1370, 1379 (11th Cir. 2008) (quotation marks omitted). These acts are not properly "brought under a hostile work environment claim that centers on discriminatory intimidation, ridicule, and insult." Id. (quotation marks omitted).

1277 (explaining that "[offensive] off-handed comments in the course of casual conversation" are not actionable).  Thus, we affirm the district court's grant of summary judgment on Singleton's hostile work environment claim.

### III.

Title VII also forbids an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e–2(a)(1).  A plaintiff may establish a Title VII claim through the introduction of direct or circumstantial evidence of discrimination.  Dixon v. Hallmark Cos., Inc., 627 F.3d 849, 854 (11th Cir. 2010).

The district court correctly found that Singleton did not present direct evidence of racial discrimination.  "Direct evidence is evidence, that, if believed, proves the existence of a fact without inference or presumption."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (quotation marks and alterations omitted).  Singleton argues that he presented direct evidence of race discrimination because he was called "Do Boy"; another black employee was referred to as a "n____"; Human Resources inquired about his positive work evaluation; and it was rumored that an Auburn employee said that black employees should not make $95,000.  We find that this is not direct evidence because these remarks were not related to the alleged discriminatory decisionmaking at Auburn.

9

Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination."). Because this evidence does not prove a discriminatory motive, it is circumstantial evidence. Wilson, 376 F.3d at 1086.

When a plaintiff offers circumstantial evidence, the discrimination claim is analyzed using the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under McDonnell Douglas, the plaintiff must first establish a prima facie case of disparate treatment by showing that: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly-situated employees outside of his class more favorably; and (4) he was qualified to do the job. McCann, 526 F.3d at 1373. If the plaintiff presents a prima facie case, the burden is shifted to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. Id. If the employer can offer such a reason, the burden is then shifted back to the plaintiff to show that the employer's offered reason is a mere pretext for unlawful discrimination. Id.

Singleton has failed to make a prima facie case of race discrimination because he has not shown that his employer treated similarly-situated employees outside of his class more favorably. He says that Morris and Blake, white

10

employees, assumed his duties after his position was outsourced. From this, he argues his "position was not eliminated [but] was given to white employees," who were treated more favorably than him. However, Singleton has not pointed to any similarly-situated employees outside his race who were treated more favorably. In fact, all trade service positions within his department were outsourced. Of the twelve employees whose positions were outsourced, six were black and six were white. Because Singleton did not present evidence that similarly-situated employees outside his class were treated more favorably, he has failed to make a prima facie case of discrimination. See Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323–25 (11th Cir. 2006). Thus, we affirm the district court's grant of summary judgment on Singleton's race discrimination claim.

## V.

For these reasons, we affirm the district court's grant of summary judgment.

**AFFIRMED.**