[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-11118
Non-Argument Calendar
_____

D.C. Docket No. 1:18-cv-00143-AW-GRJ

JOHN ANNARUMMA,

Plaintiff-Appellant,

versus

CITY OF HIGH SPRINGS FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 11, 2021)

Before MARTIN, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

John Annarumma, a Florida Army National Guard member, served the City of High Springs police department as a probationary patrol officer for 18 months. He then gave his two weeks' notice, cashed out his retirement, and resigned. Three years after he resigned, Annarumma sued the City, alleging discrimination based on his Caucasian race and military service. Because we conclude that the district court properly granted the City's motion for summary judgment, we affirm.

## I.    Background

### A.    Annarumma's Background

In November 2013, the City hired Annarumma as a patrol officer on probation. It was standard practice for the department for officers to be on probation during their first year of employment. While working for the City, Annarumma was also an active national guard member and was periodically away from the police department performing his national guard duties. Before working for the City, Annarumma obtained a bachelor's degree, served in the Army, and worked at three other police departments in various roles. Although Annarumma served in a supervisory role in the Army, Annarumma never held a supervisory role in a police department.

2

B.    Department Background

Shortly before and while Annarumma worked for the City, the police department underwent multiple administrative changes.  Before Annarumma was hired, Steve Holley, a patrol officer, was promoted to Sergeant for three days and then promoted to Chief of the police department.  Holley was serving as Chief when Annarumma was hired.

When new city manager Ed Booth took over, he determined that the department was in "disarray" and "required reorganization."  Booth, an Army veteran and experienced city manager, determined that the department lacked strong leadership, caused in part by the promotion of Chief Holley from patrol officer to Chief so quickly.  Booth thought Holley was not qualified to be Chief because he did not possess the proper training, experience, and leadership skills to be the head of the department.  In reorganizing the department, Booth began the search for a qualified Chief and offered to return Holley to the rank of Sergeant.  Holley declined the offer and resigned.

When Holley resigned, the department employed only two Sergeants.  The rest of the employees in the relatively small department were patrol officers like Annarumma.[1]  Booth appointed one of the Sergeants, Antoine Sheppard, to serve

---

[1]  At this time, the department had twelve budgeted positions for sworn officers, which included one Chief, three Sergeants, and eight patrol officers.  These positions were not always full, so the department occasionally had fewer than twelve officers.

3

as the interim Chief while the City searched for a professional police Chief.  The City also hired a consulting team to evaluate the department's policies and procedures.  The team recommended several changes, including adding a Lieutenant position (a higher rank than Sergeant) to the department's staff.  Booth accepted this recommendation and secured funding for the new Lieutenant position.

Booth determined that the position should be filled internally so that the new Chief, when hired, would "inherit a [L]ieutenant familiar with the community and [the department's] operations."  In Booth's mind, there were two potential qualified internal applicants: the two existing Sergeants.  Booth thought Sheppard was the "only qualified candidate," but said he "would have considered" the other Sergeant as well.  Initially, the job qualifications for Lieutenant included an associate's degree requirement.[2]  When Booth learned of this requirement, he decided to reduce the educational requirements and include "a focus on

---

[2]  The original Lieutenant job posting said:

Supervisory, administrative and professional law enforcement position.  Serves as division commander (Patrol/Investigations).  Schedules staff, leads programs and projects.  Assists with hiring of staff, procurement and budget preparation/management.  Conducts investigations and general law enforcement duties as required.  BS/BA preferred.  AA/AS degree required.  (5) years supervisory experience in law enforcement, two of which may be substituted by a BA/BS degree.  CJSTC/FDLE Law Enforcement Cert. required. . . . .

4

supervisory experience" because Sheppard, who he had in mind for the job, did not have an associate's degree at the time.[3]

C.    Lieutenant Job Posting

While Annarumma was away from the department for an annual two-week national guard training from August 1–17, 2014, the City advertised the new Lieutenant position in the department. The City only advertised the job posting internally and posted it for five business days, in compliance with City policy.[4] Annarumma was unaware of the opening until he returned from his two-week training, and he had already missed the deadline to apply. On August 27, 2014, Annarumma e-mailed Booth's assistant stating:

> I was told that there was an internal posting for the position of Lieutenant that opened on the 12th of August through the 17th of August. The position was not advertised via email as previous in house postings had been, and as a result of attending my Florida National Guard annual training on military orders from 1 August 2014 to 17 August 2014, I was unable to observe any flyer or posted job

---

[3] The revised Lieutenant job posting said:

> Supervisory, administrative and professional law enforcement position. Serves as division commander (Patrol/Investigations). Schedules staff, leads programs and projects. Assists with hiring of staff, procurement and budget preparation/management. Conducts investigations and general law enforcement duties as required.

> High school graduation or possession of an acceptable equivalency diploma. Special courses in supervision and police management. Experience as a certified sworn officer within the Department. (A comparable amount of training, education or experience can be substituted for the minimum qualifications.)

> CJSTC/FDLE Law Enforcement Cert. required. . . . .

[4] The City's Personnel Policies and Procedures Manual required the position to be posted "not less than (5) working days."

5

announcement within the confines of the HSPD building.  With regards to the position I would like to request it be re-advertised for potential application submission.  Thank you.

Booth's assistant responded: "I spoke to Mr. Booth regarding reposting the position.  He advised the position was posted correctly and will not be reopened.  Please feel free to contact me if you have any questions."  Annarumma did not respond with questions.

Two days before Annarumma inquired about reopening the position, another probationary patrol officer in his first year with the department who was not in the military sent Booth's assistant a similar e-mail asking for the position to be reopened because he had not seen the job posting.  That request was likewise denied.

Annarumma said he "probably" expressed his interest in the Lieutenant position to others in the department before he left for his national guard training.  Annarumma believed, based on a "kind of an intuition about things" that the Lieutenant position was deliberately posted at a time when he would be unable to apply for it, but he never found support for that suspicion.

D.    Sheppard Promoted to Lieutenant

Only one of the department's two Sergeants, Sheppard, applied for the Lieutenant position.  Shortly after Sheppard applied, Booth named Sheppard as the new Lieutenant.  Sheppard had worked for the department for more than thirteen

6

years, been a Sergeant for nine years, had the most supervisory experience of anyone in the department, and was serving as the interim Chief. Annarumma, on the other hand, was a probationary, non-supervisory officer who had been with the department less than a year. Although Annarumma thought he was qualified for the Lieutenant position, Booth, who made the City's hiring decisions, did not. Booth thought Annarumma was unqualified because he did not have the necessary five years of supervisory law enforcement experience and was still a probationary employee in the department. And although Annarumma possessed the requisite educational qualifications under the original posting, he was "an unknown" to the department. Booth "learned from the experience with Chief Holley" that promoting a patrol officer to Chief was a "bad idea." Booth said "[h]ad [he] considered Annarumma . . . a probationary non-supervisory officer . . . for the rank of Lieutenant and authorized him to pass over other ranking officers . . . morale in the department would have been damaged."

E.    Disciplinary Actions, Car Assignment, and Schedule Change

After receiving the promotion to Lieutenant, Sheppard remained the interim Chief for approximately six more months until February 2, 2015, when the City hired Chief Jack Anterio. During the time between Sheppard's promotion to

Lieutenant and Chief Anterio's hiring, Annarumma says he went from "hero to zero."

Annarumma claims that Sheppard wrongfully disciplined him for "trivial" things throughout this period. Annarumma received "verbal counseling" but was not formally disciplined after he was accused of yelling at a coworker and kissing a girl while in uniform. Sheppard also wrote Annarumma up for "dereliction of duty" for allegedly failing to write a necessary report on a burglary call.

Annarumma also was unhappy with his patrol car assignment. The department had "a problem with cars in general." Annarumma was assigned an "older" car he called a "piece of junk" instead of one of the "four decent" cars available. Annarumma said newer officers, most of whom were black, were being assigned nicer cars than him. When Annarumma's police car was in the shop, he had to drive a pool car which, pursuant to a "new policy," could not be driven home. Annarumma, and other officers in the department, complained to Sheppard about car assignments. Annarumma thought his car assignment had something to do with his race but admitted that he had no reason to believe he was given a lesser car because of his military status.

Finally, Annarumma was upset about his schedule change. Every year, pursuant to a union contract, the department issued new schedules. Annarumma said under his new schedule "every time [he] got drilled, [it was] always on a

8

weekend . . . [he was] off." In other words, under his new schedule, Annarumma claims most of his weekends were filled with either national guard drills or police department work. Previously, his weekend police department work was scheduled on the same weekends as his national guard work, so the City had to find someone to cover his shifts on those weekends. Annarumma did not complain about problems with his new schedule.

During this time, Sheppard approved retaining Annarumma at the end of his one-year probationary period. When Chief Anterio took over in February 2015, Annarumma discussed the issues he had been having with Sheppard with Chief Anterio. Annarumma said that the "stuff that was going on" stopped after Chief Anterio took over. Annarumma got along well with the new Chief, and Annarumma said Chief Anterio treated him fairly. Even so, four months later, Annarumma turned in his two weeks' notice, cashed out his retirement, and resigned. Annarumma said the department was "too hostile to stay," and he wanted to leave under his own power without being "terminated or forced out." Annarumma never complained to the City about being discriminated against based on his military status or race.

Vernon Higginbotham, a fellow officer, recalled a conversation with Annarumma that took place after Annarumma turned in his two weeks' notice. Higginbotham testified that Annarumma told him that he had resigned because he

9

was burned out with law enforcement, tired of responding to calls, and that it had

"nothing to do with anyone [in the department]." Higginbotham also said

Annarumma talked about cashing out his retirement and his plan start a business.

Three years after he resigned, Annarumma sued the City alleging

discrimination, retaliation, and a hostile work environment in violation of the

Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38

U.S.C. §§ 4301–34, race discrimination in violation of 42 U.S.C. §§ 1983 and

1981, and a violation of the Florida Uniformed Servicemembers Protection Act

("FUSPA"), Fla. Stat. Ann. §§ 250.80–905. The district court granted summary

judgment to the City on all Annarumma's claims. Annarumma appealed.

Annarumma argues that the district court erred by: (1) finding that the City

did not discriminate against him in violation of USERRA by failing to promote or

reopen the promotional process for him;[5] (2) finding that he had not established a

---

[5] Annarumma also asserted a USERRA retaliation claim before the district court. The statute provides, in relevant part, that "[a]n employer may not discriminate in employment against or take any adverse employment action against any person because such person . . . has exercised a right provided for in this chapter." 38 U.S.C. § 4311(b)(4).

Annarumma claimed that he asserted his USERRA rights by sending Booth's assistant an e-mail asking the City to reopen the Lieutenant position (without ever mentioning USERRA), and that the City retaliated against him after he did so. The district court granted summary judgment to the City on Annarumma's retaliation claim because even assuming the e-mail qualified as an exercise of USERRA rights, Annarumma failed to present evidence from which a reasonable jury could conclude that the City retaliated against Annarumma for asserting his USERRA rights. On appeal, Annarumma only asserts error with the district court's findings related to Annarumma's USERRA discrimination and hostile work environment claims. Accordingly, Annarumma has abandoned any arguments related to his USERRA retaliation claim. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

10

hostile work environment nor constructive discharge claim; and (3) finding that the City did not violate the FUSPA.[6]

## II.    Standard of Review

We review a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1161–62 (11th Cir. 2006). Summary judgment is appropriate if the movant shows that no genuine issue of material fact exists, and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F. 3d 1321, 1326 (11th Cir. 2005).

## III.    Discussion

A.    USERRA Discrimination

Under USERRA, a member of a uniformed service shall not be denied a "promotion, or any benefit of employment by an employer on the basis of that membership [or] performance of service." 38 U.S.C. § 4311(a).[7] An employer

---

[6] Because Annarumma does not argue that the district court erred in granting summary judgment to the City on his racial discrimination claims under 42 U.S.C. §§ 1983 and 1981, he has abandoned any such argument. *See Access Now, Inc.*, 385 F.3d at 1330.

[7] In full, 38 U.S.C. § 4311(a) and (c)(1) provide:

(a)    A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment,

violates this provision when an employee's membership or performance of service is a "motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or service." 38 U.S.C. § 4311(c)(1).

A USERRA discrimination claim brought under § 4311 requires proof of the employer's discriminatory motive. *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005). To establish a *prima facie* case of USERRA discrimination, an employee must demonstrate by a preponderance of the evidence that his military membership or service was a motivating factor in the employer's decision to take an adverse employment action covered by § 4311. *Id*. A motivating factor does not have to be "the sole cause of the employment action." *Id*. Rather, "it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Id*. (quotation omitted)

---

retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

\* \* \*

(c)    An employer shall be considered to have engaged in actions prohibited—

(1)    under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service[.]

12

A court can infer a discriminatory motivation from a variety of considerations, such as: (1) the temporal proximity between the employee's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members protected by the statute combined with its knowledge of the employee's military activity; and (4) disparate treatment of similarly situated employees. *Id.*

Once an employee meets the *prima facie* burden, the burden shifts to the employer to prove, by a preponderance of the evidence, that legitimate reasons, standing alone, would have induced it to take the same adverse action. *Id*. at 1238–39. Even if prohibited discrimination was a motivating factor, the employer does not violate the statute if "the employer can prove that the action would have been taken in the absence of [the employee's military status]." 38 U.S.C. § 4311(c)(1). The standard of proof the employer must meet is "the so-called- 'but for' test." *Coffman*, 411 at 1238 (quoting *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001)).[8]

---

[8] Annarumma argues the district court erred by placing the burden on him to show that the City's given reasons for failing to promote him or reopen the promotion process were pretext for discrimination. After the district court explained and applied the *Coffman* framework, it cited an unpublished opinion of our Court considering a USERRA claim which, though it cited *Coffman*, also cited and considered the *McDonnell Douglas* framework concerning the plaintiff's burden in pretext cases under Title VII. *See Landolfi v. City of Melbourne, Fla.*, 515 Fed. Appx. 832, 835 (11th Cir. 2013) (explaining that in a USERRA case "[a] plaintiff may establish pretext indirectly by showing that an employer's proffered reason for its decision is unworthy of

13

Annarumma argues that the City discriminated against him based on his military status in violation of § 4311 in two ways.  First, by promoting Sheppard to Lieutenant instead of him, and second, by denying him the opportunity to apply for the promotion.[9]  Annarumma says the timing and manner of the posting evidenced

credence" which can be accomplished by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason so that a reasonable factfinder could conclude that it is unworthy of credit" (citing *Jackson v. State of Ala. Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005))).

Our *Coffman* decision made clear; however, that the two-step framework it articulated "applies to both so-called 'dual motive' cases and so-called 'pretext' cases."  411 F.3d at 1239 (quoting *Sheehan*, 240 F.3d at 1014).  In *Coffman*, we adopted the framework the Federal Circuit articulated in *Sheehan*, which clarified that "[t]he procedural framework and evidentiary burdens set out in [USERRA] . . . are different from those in discrimination cases under Title VII of the Civil Rights Act of 1964 . . . as described in *McDonnell Douglas . . .* and subsequent decisions."  *Sheehan*, 240 F.3d at 1014.  "*McDonnell Douglas*, while allocating the burden of production of evidence, does not shift the burden of persuasion to the employer" like the two-step *Coffman* framework does.  *Id.*  In other words, under *Sheehan* and *Coffman*, the employer has the heavier burden to prove that it would have taken the adverse action even in the absence of the employee's military status.  *Id.* at 1013; 38 U.S.C. § 4311(c)(1).

In any event, the outcome in this case is the same under either framework because, as explained further below, the City met its higher burden under *Coffman* to demonstrate it would not have promoted Annarumma to the Lieutenant position regardless of Annarumma's military status.

[9]  Section 4311 specifies that denying a military member a "promotion" based on his or her protected status is an "adverse employment action" covered by USERRA.  It is less clear that the statute covers the opportunity to apply for a promotion.  Annarumma argues that the opportunity to apply for a promotion qualifies as a "benefit of employment" specified in the statute.

The statute defines "benefit of employment" as the "terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment."  38 U.S.C. § 4303(2).

The district court suggested, without deciding, that the opportunity to "apply for positions [employees] have no chance of landing" is not a "benefit of employment" covered by § 4311.  Because we agree with the district court that the City proved it would have taken the same action

14

the City's motive to exclude him based on his military status because he missed learning of the opportunity to apply because he was at a mandatory national guard training. The district court denied Annarumma's USERRA discrimination claim because it determined that, based on the record evidence, no reasonable jury could conclude that the City discriminated against Annarumma based on his military status. The court concluded that even assuming Annarumma met his initial *prima facie* burden, the City sufficiently met its burden to show it would have taken the same actions—not promoting Annarumma and not reopening the promotional process for him—regardless of his military status. We agree.

First, the City established that regardless of Annarumma's military status, it would not have promoted him to the new Lieutenant position. The Lieutenant position was created as part of a restructuring plan, recommended by independent consultants, to improve the department's flaws partially created by promoting a patrol officer to a higher rank too quickly. Booth posted the position with one—possibly two—internal candidates in mind: the two Sergeants.[10] Not only was Annarumma not a Sergeant, he was ineligible to even be promoted to Sergeant

_____

regardless of Annarumma's military status, we need not decide whether the City's decision not to reopen the promotional process for Annarumma denied him a "benefit of employment" covered by § 4311.

[10] Booth's position was that "before any internal candidate could be a [L]ieutenant . . . he/she would first have to serve as [S]ergeant."

15

because of his probationary status.[11]  Sheppard, on the other hand, had been a

Sergeant for nine years, had more supervisory experience than anyone in the

department, and was acting as the interim Chief.  Booth's goal for the Lieutenant

position was to provide the new Chief with someone familiar with the community

and the department.  At that time, Annarumma had been with the department less

than nine months.  Sheppard, in contrast, had been with the department for thirteen

years.  Booth, who had the ultimate hiring authority, did not believe Annarumma

was qualified for the position and thought Sheppard was the only internal

candidate who was qualified.

Annarumma argues that because Booth changed the educational

requirements listed on the initial job posting with Sheppard in mind, the City's

explanation that he was unqualified for the position was a pretext for

discrimination.  We are not persuaded.  While Annarumma may be correct that the

Lieutenant promotional process was geared towards promoting Sheppard

specifically, the City demonstrated that it did not exclude Annarumma because of

his military status.  On the contrary, it showed that Booth thought that Sheppard

was the best officer for the job, and the City was trying to avoid repeating its past

---

[11]  The City's 2010 written directive lists eligibility requirements for different ranks.  One of the requirements for Sergeant is that the officer "[n]ot be on any form of probation or discipline."

mistake of allowing patrol officers to jump ranking officers into supervisory roles in the department.[12]

The City also established that it would have made the same decision to decline reopening the promotional process regardless of Annarumma's military status. The City identified a non-military probationary patrol officer who also asked for the Lieutenant promotional process to be reopened because he did not see the posting. The City denied his request in the same manner it denied Annarumma's request.

The City met its burden to demonstrate that even if Annarumma were not a member of the military, it still would have promoted Sheppard to the Lieutenant position over Annarumma and not reopened the position to allow him (or other probationary patrol officers) to apply for the Lieutenant position after the deadline. There was no evidence in the record for a reasonable jury to conclude that the promotional process was designed to exclude Annarumma based on his military

---

[12] Annarumma cites *Carroll v. Delaware River Port Auth.*, 843 F.3d 129 (3d Cir. 2016), for the proposition that Annarumma did not need to be qualified for Lieutenant to succeed in his USERRA claim. In *Carroll*, the Third Circuit determined that a USERRA plaintiff, in his *prima facie* case, did not have to plead or prove that he was objectively qualified for a promotion to meet his initial burden. But, the court said, "employers may raise a plaintiff's lack of qualifications as a nondiscriminatory justification for declining to promote the plaintiff, notwithstanding his or her military service." *Id.* at 130. We have not considered whether a plaintiff must prove he was objectively qualified for a position as part of his initial *prima facie* case. But even if Annarumma did not have to prove he was qualified to have a plausible USERRA claim, the City was free to use Annarumma's lack of qualification as part of its affirmative defense, which it did here.

17

status.  *Coffman*, 411 F.3d at 1238.  Accordingly, the district court properly granted summary judgment to the City on Annarumma's USERRA discrimination claims.[13]

B.      Hostile Work Environment and Constructive Discharge Claims

Annarumma contends that the Title VII frameworks for hostile work environment and constructive discharge claims apply to his USERRA claims, and the City has not disputed that contention.  Accordingly, we, like the district court, will assume without deciding that these claims are actionable under USERRA and analyzed under our Title VII test.

To prove a *prima facie* case for a hostile work environment under Title VII, a plaintiff must show that: "(1) he or she belonged to a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment, and (5) a basis exists for holding the employer liable."  *Trask v.*

---

[13]  Annarumma also argues that the district court erred by "failing to reach the issue of willfulness."  Annarumma cites a Second Circuit case, *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169 (2d Cir. 2011), for this proposition.  Annarumma's argument is unavailing. "Willfulness" factors into a court's analysis when determining damages for a USERRA violation.  USERRA provides that a prevailing party may be entitled to a liquidated damages award for backpay upon a determination that "the employer's failure to comply with the provisions of [USERRA] was willful."  38 U.S.C. § 4323(d)(1)(C).  Because the district court correctly found that Annarumma's USERRA discrimination claim failed, a willfulness determination is irrelevant in this case.

*Sec'y, Dep't of Veterans Affs.*, 822 F.3d 1179, 1195 (11th Cir. 2016), *abrogated on other grounds by Babb v. Wilkie*, 140 S. Ct. 1168 (2020).  The severe or pervasive requirement "contains both an objective and a subjective component."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).  In evaluating the objective severity of a hostile work environment, we consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Id.*

To establish a constructive discharge claim, the employee must demonstrate "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work[] environment" claim.  *Bryant v. Jones*, 575 F.3d 1281, 1298–99 (11th Cir. 2009) (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994)).  "Constructive discharge occurs when an employer deliberately makes working conditions intolerable, thereby forcing the employee to quit his job."  *Id.* at 1298 (quotation omitted).

To establish his hostile work environment and constructive discharge claims, Annarumma points to the following actions: (1) the City promoted Sheppard instead of him to Lieutenant and declined his request to reopen the promotional process; (2) the department informally disciplined him on three occasions for

19

"trivial and unsupported" reasons; (3) the department assigned him an unreliable patrol car; (4) the department assigned him a "pool car" when his patrol car was being repaired which could not be used for commuting; and (5) the department issued him a new schedule that did not conflict with his military obligations.

The district court determined that Annarumma did not provide evidence that he was being harassed nor evidence that any alleged harassment was causally related to his military status. Because we agree that Annarumma did not present evidence that the City created a hostile work environment or constructively discharged Annarumma, we need not address the district court's alternative holding that Annarumma also did not prove causation.

First, Annarumma's hostile work environment claim fails because he did not present any evidence that the actions he describes were severe or pervasive. On the contrary, the record reveals that the alleged "harassment" was short-lived, sporadic, and ceased once Chief Anterio took over the department. Even before Anterio became Chief, the alleged harasser, Sheppard, supported Annarumma being taken off probation. None of the conduct Annarumma complains of was physically threatening or humiliating and there is no evidence that it interfered with Annarumma's job performance. Even if Annarumma subjectively felt like he was being harassed, his allegations, accepted as true, do not rise to the level of objective harassment. *Miller*, 277 F.3d at 1276.

20

Because Annarumma failed to establish a hostile work environment claim, he likewise did not meet the higher burden to establish a constructive discharge claim. *See Bryant*, 575 F.3d at 1298–99. The district court properly granted the City's motion for summary judgment on both claims.

C.    FUSPA claim

Annarumma argues he is also entitled to statutory penalties under FUSPA, which provides:

> In addition to any other relief or penalty provided by state or federal law, a person is liable for a civil penalty of not more than $1,000 per violation if that person violates any provision of this chapter affording protections to members of the United States Armed Forces, the United States Reserve Forces, or the National Guard or any provision of federal law affording protections to such servicemembers over which a state court has concurrent jurisdiction under s. 250.82.

Fla. Stat. Ann. § 250.905. This provision requires Annarumma to point to either a Florida statute or federal law as a predicate violation. Annarumma only points to the USERRA violation discussed above as the predicate offense for his FUSPA claim. Because we affirmed the district court's grant of summary judgment to the City on Annarumma's USERRA discrimination claim, we likewise affirm the district court's grant of summary judgment on Annarumma's FUSPA claim.[14]

---

[14] The City argued in the alternative that FUSPA is not applicable here for various reasons. We need not address the City's alternative argument because we agree that Annarumma's FUSPA claim, assuming FUSPA applies here, fails with Annarumma's USERRA claim.

## IV.    Conclusion

For these reasons, we affirm the district court's grant of summary judgment to the City on all Annarumma's claims.

**AFFIRMED.**