[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11049

_____

D.C. Docket No. 3:12-cv-00728-HLA-JRK

MICHELLE CORBETT,

Plaintiff - Appellant,

versus

RICK BESELER,
in his official capacity as Sheriff of Clay County,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 30, 2015)

Before ROSENBAUM and FAY, Circuit Judges, and MIDDLEBROOKS,[*]
District Court Judge.

---

[*] The Honorable Donald M. Middlebrooks, United States District Court Judge for the Southern District of Florida, sitting by designation.

PER CURIAM:

Michelle Corbett appeals partial summary judgment and judgment as a matter of law under Federal Rule of Civil Procedure 50(b) for Rick Beseler, Sheriff of Clay County, Florida,[1] in her employment discrimination action concerning the Clay County Sheriff's Office ("CCSO").  We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Corbett's CCSO Employment History

Corbett was hired in August 2003 as a CCSO Deputy Sheriff.  In July 2004, Corbett applied for and obtained the position of Youth Resource Officer, where she worked for approximately three years.  In 2007, Corbett applied for an open detective position in Narcotics, a division of CCSO Organized Crime Unit.[2]

Following her application, Corbett was interviewed and selected by Lieutenant Barry Abramowitz to transfer to Narcotics, a lateral position, on May 14, 2007.[3]   While meeting the requirements for detective, Corbett, the only woman in the Narcotics division, had strained relationships with the male

---

[1] Corbett sued Sheriff Beseler in his official capacity; her claims do not concern Sheriff Beseler directly.

[2] The Organized Crime Unit is comprised of various subdivisions, including Street Crimes and Narcotics.  Within the Narcotics division are subsections with individuals who specialize in certain areas, such as pharmaceuticals, methamphetamine ("meth") labs, or marijuana-grow houses.  Narcotics detectives can be assigned to assist with other Narcotics operations.

[3] As a detective, Corbett received $50 incentive pay every two weeks for a clothing allowance, since Narcotics detectives wear their personal clothes rather than a uniform.

2

detectives.  She admitted the male detectives considered her to be demeaning and critical of their job performance.  Consequently, they did not like working with her.  From October 2007 until his transfer in October 2009,  Sergeant Wayne McKinney directly oversaw Corbett and the Narcotics division.  He generally gave Corbett positive evaluations, although his evaluations noted she could be abrupt and rude toward others.

Detectives in Narcotics are assigned partners with whom they work, including backing up each other.  Corbett's first two partners were Detectives David Vaughn and Greg Michon.  Throughout her tenure in Narcotics, Corbett and Michon were partnered from time to time.  While it was rumored they were having an affair, Corbett testified they did not have an affair, but they had a friendly relationship.

On September 6, 2009, Lieutenant Abramowitz, who oversaw the Organized Crimes Unit, including changing partners, reassigned Michon and Corbett with new partners.  Because Corbett and Michon were more experienced detectives, Lieutenant Abramowitz determined they should work in a training role by providing guidance to inexperienced detectives.  In addition, Lieutenant Abramowitz thought Corbett needed to demonstrate she could handle cases without relying on Michon, since there was a perception he handled the majority of their case work.

Although giving Corbett and Michon new partners was a decision from their chain of command, Corbett and Michon openly questioned their reassignment with coworkers.  When Corbett's complaining continued, Lieutenant Abramowitz met her one evening in front of a Winn-Dixie to discuss the separation in partners. Lieutenant Abramowitz explained he had separated them so Corbett could become a leader in the division and enhance her career.  She did not think that would be the result, because she is a woman, and she perceived no one would listen to her. Lieutenant Abramowitz counseled her the likely reason others would not listen was because she could be overbearing, but he believed she could be successful in the detective role, despite potential difficulties encountered by women in law enforcement.

Nonetheless, Corbett continued to complain to Lieutenant Abramowitz concerning her displeasure with the repartnering; she further went up the chain of command and complained directly to Captain Senters in 2009.  She told Captain Senters she was unhappy with the move of Michon back to Patrol and being told she could not work directly with Michon without permission.  Captain Senters explained he thought Michon should have been moved to Patrol a year before, because he had spent too much time in Narcotics.  At this December 2009 meeting with Captain Senters, Corbett did not complain of lacking training, not getting

4

overtime, or gender discrimination; her complaint was limited to moving Michon to Patrol.

Corbett then was assigned as a Field Training Officer to Detective Hanlin, who had moved into Narcotics from Street Crimes. Corbett and Hanlin had personality conflicts. Hanlin complained to his supervisors Corbett was bossy and condescending toward him. Thereafter, Sergeant McKinney addressed the problem with Corbett and informed her she came across as "bitchy and demeaning." He suggested the other detectives would be more receptive if she used a more welcoming, less demeaning tone. In October 2009, Sergeant McKinney left Narcotics and was replaced by Shawn Gordon. Corbett represents Sergeant Gordon also told her she was bossy and abrasive; other detectives did not like her attitude, and she needed to change her behavior.

Although Corbett and Michon were no longer partners, they were assigned to work together in dismantling meth labs. They also continued working together without their supervisors' approval, which left Detectives Lavaron and Hanlin without partners, requiring them to work together. Following Detective Hanlin's complaints, Sergeant Gordon explained to Corbett she needed to partner with Detective Hanlin rather than returning to Michon.

Corbett also had issues with Detective Lavaron, with whom she had performed multiple trash pulls to look for evidence of a crime. In the course of one

5

trash pull, Corbett drove the vehicle away when the suspect came out of the house, which left Detective Lavaron stranded in the suspect's yard. In addition, Corbett spoke condescendingly to Detective Lavaron. From his work experiences with Corbett, Detective Lavaron preferred not to work with her, because she constantly was condescending toward him and had put him in an unsafe situation during a trash pull, which caused him not to trust her with his life.

Corbett had received extensive training during her tenure in Narcotics, including becoming certified to dismantle a meth lab. She contends she requested to attend a tracking training in Tampa in September 2009, but she was not permitted to attend. Sergeant McKinney does not recall denying Corbett this training opportunity. She also claims she requested to attend gambling training in 2009 but was denied. No one attended the gambling training, because money was not in the CCSO budget to finance it, and the instructor was not considered an expert by the State Attorney's Office.

While Corbett complains she was not given the same overtime opportunities as the male detectives, overtime largely was voluntary. A whiteboard with overtime assignments, primarily trash pulls, was in the Narcotics office, and interested detectives placed their names on the board. Assignments were on a first-come-first-served basis. Corbett received substantial overtime in Narcotics. During the time she was not certified to dismantle meth labs, Corbett nonetheless

was given overtime dismantling meth labs throughout 2008 and 2009. She also admitted she received some overtime and never was denied any overtime opportunity she requested on the whiteboard.

After being certified to dismantle meth labs in 2009, Corbett acquired significant hours of overtime from November 2009 through January 2010.[4] During a six-month period, Corbett received more overtime than Detective Seeley, a male Narcotics coworker. She also had more overtime hours than Detective Michon during the six-month time prior to his leaving Narcotics. Corbett took a significant amount of leave time during that six-month period, at least 90 hours. Neither Sergeant McKinney nor Sergeant Gordon purposefully excluded Corbett from overtime opportunities; Corbett never complained to them she wanted more overtime.[5]

---

[4] Although Corbett claims she repeatedly was denied training opportunities for methamphetamine school, the ability to attend the trainings depended on when they were offered. When Sergeant McKinney got approval, Corbett and Detective Lavaron were the first employees sent to the school to receive certification to disassemble meth labs. Corbett also had a three-day recertification course in February 2010 and a Leadership Privacy Seminar in March 2010. She was called eleven times from November 2009 to February 2010 to dismantle meth labs. Corbett was offered the chance to attend a DEA-sponsored school relating to site safety, but she was unable to attend, because of a prearranged family vacation. Consequently, the DEA did not give CCSO the opportunity to send other employees to the class. Corbett requested and was permitted to attend a stress-management-incentive school. Upon completion, the state paid Corbett additional money for attending. Although Corbett claims she repeatedly was denied training opportunities, she told her doctor she was well trained and knew her job well.

[5] Corbett claims she was denied overtime on one occasion, when CCSO did not send her to dismantle a marijuana-grow operation and meth lab. Instead, Detectives Lavaron and Hanlin, who was uncertified, were sent on this job. Based on the small size of the meth lab, Sergeant

7

Believing she could no longer do her job with the male detectives in Narcotics, who allegedly would not work with her, Corbett requested a transfer to Warrants, which she did not receive. Thereafter, Lieutenant Abramowitz counseled Corbett concerning the struggles and success of females in law enforcement. He viewed himself as a mentor to Corbett and gave her the example of his wife, who had been successful in twenty-five years of law enforcement.

Prior to his leaving Narcotics to work in Pharmaceutical Investigations in October 2009, Sergeant McKinney spoke to Corbett about the possibility of her moving to Pharmaceutical Investigations. He believed it presented a growth opportunity for her, and she could be successful there. Although Corbett initially turned down the offer to move to Pharmaceutical Investigations, a management decision was made in May 2010 to assign her there. Since Pharmaceutical Investigations received federal funding and participated in the state High Intensity Drug Trafficking task force, it provided Corbett with many opportunities to earn overtime. She additionally was sent for training for a week in May 2010 for Pharmaceutical Investigations.

On May 27, 2010, the Narcotics and Street Crimes divisions executed a search warrant in which Corbett participated. Later that day, Sergeant Gordon

---

Gordon decided certified Detective Lavaron could disassemble it, while uncertified Detective Hanlin interviewed witnesses at the crime scene.

conducted routine debriefing, during which Corbett became defensive and accused Sergeant Gordon of blaming her for mishandling evidence. When the discussion became heated, Lieutenant Abramowitz took Corbett and Sergeant Gordon into his office. He was concerned with Corbett's reaction to Sergeant Gordon's inquiry about the evidence; she represents Lieutenant Abramowitz and Sergeant Gordon had yelled at her during the debriefing. Corbett became upset and yelled at Sergeant Gordon. Because tempers continued to flare, Lieutenant Abramowitz ended the meeting and told Corbett they would speak again the next day.

On the morning of May 28, 2010, Corbett again met with Lieutenant Abramowitz and Sergeant Gordon. She testified she was told to "sit down, be quiet, [and] don't speak until spoken to"; she was required to listen to Sergeant Gordon's orders. Corbett claims Sergeant Gordon firmly told her she was not to speak of him; she was to do exactly as she was told; he reminded her he was in charge; and he informed her she would handle the pill cases he assigned to her or those she generated herself. At that time, Corbett already was working in Pharmaceutical Investigations.

## B. Internal Investigation

Following the May 28, 2010, meeting with Lieutenant Abramowitz and Sergeant Gordon, Corbett was emotional and went to Human Resources Director, Leigh Corley, to complain. At the conclusion of their meeting, Corley asked

9

Corbett to submit a written complaint and sent her home on paid administrative leave for that purpose. Corbett's complaint, delivered to Corley on June 3, 2010, was dated May 31, 2010, and contained a number of complaints against her chain of command and coworkers. Corley prepared a letter dated June 4, 2010, which detailed the dates for incidents referenced in Corbett's initial complaint. Corbett temporarily was reassigned to the Intelligence Unit during the investigation, so she did not have to report to the chain of command against whom she had complained.

Prior to May 28, 2010, Corbett had not complained to anyone at CCSO regarding gender discrimination. Corley investigated Corbett's allegations that she was not receiving overtime fairly because of her gender. Since Corbett's internal complaint did not claim that she lacked training, that issue was not investigated.

While the internal investigation was being conducted, Corbett filed an EEOC charge. Captain Virgil Lee Harris was assigned to investigate Corbett's additional allegations in her EEOC charge. After reviewing Corbett's complaint, Corley listed employees to interview and prepared questions and notes to reference those interviews.

Corbett first was interviewed by Corley on July 16, 2010. During the interview, Corbett stated she had 500 pages of notes relating to her allegations. Corley and Captain Harris requested Corbett to provide copies of her notes and

gave her 27 hours of paid administrative leave to make copies. Corbett produced only 13 pages of notes; the earliest was dated January 26, 2010.[6]

Corley prepared a report summarizing the internal investigation and submitted it to Sheriff Beseler on October 15, 2010. Both Corley and Captain Harris concluded Corbett had not been subjected to discrimination based on her gender, and she had received an equal opportunity for overtime as the male detectives. After concluding her internal investigation, Corley met with Captain Bucci and Captain Senters and provided them with the finalized investigative report. Given the result of the internal investigation, no further CCSO action was taken. In October 2010, Corbett was returned to Narcotics and remained there until she requested a transfer a few months later.

In December 2010, Corbett received a formal counseling for her violation of CCSO Code of Conduct General Order No. 1000.2 for approaching Detective Seeley, one of the interviewed witnesses in the internal investigation, and telling him "thanks for being so honest." Since Detective Seeley perceived the comment to be intimidating and stated in a sarcastic manner, he considered it to be a personal attack against him. Because Detective Seeley had not been treated this way in twenty years of service, he reported it to his supervisor, Sergeant Gordon.

---

[6] Under CCSO disciplinary policies, employees who are untruthful during an internal investigation are subject to discipline.

The counseling form was not placed in Corbett's personnel file.[7]  She lost no pay, benefits or promotional opportunities because of the counseling.  Corbett testified the formal counseling did not impact her job in any way.

For approximately six weeks from mid-December 2010 through January 2011, Corbett was out on requested medical leave for surgery.  When she returned to work at the beginning of February 2011, Corbett voluntarily requested a transfer to another detective position.  At the time of her request, the only available position was in Patrol.  Lieutenant Abramowitz and Sergeant Gordon approved her transfer to Patrol.  The move to Patrol was not a promotion or demotion; it was a lateral transfer approved by her supervisors.  Since her transfer to Patrol, Corbett has not made any internal complaints of discrimination.  She continues to be employed as a CCSO Deputy Sheriff with no reduction in pay or benefits.

## C. District Court Proceedings

Following the requisite administrative proceedings, Corbett filed her federal action in the Middle District of Florida under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Florida Civil Rights Act ("FCRA"), Fla.

---

[7] Under CCSO General Order No. 2000.2, after a formal counseling has been retained in the supervisor's file for a year, it is removed from the file and destroyed.

12

Stat. § 760.01 et seq.[8]  She alleged hostile work environment, gender discrimination, and retaliation.

Counsel for Sheriff Beseler moved for summary judgment.  The district judge granted the motion in part and dismissed the hostile work environment claim.  He concluded the comments advanced by Corbett were "not sufficiently severe or pervasive" to "support her case using a hostile environment theory" under binding case law.

The case proceeded to trial, where Sheriff Beseler's counsel moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).  At the close of all evidence, the judge granted Sheriff Beseler's renewed motion for judgment as a matter of law.  The judge concluded the facts presented by Corbett did not constitute legally actionable gender discrimination or retaliation.  On appeal, we determine whether the decisions by the district judge regarding Corbett's hostile work environment, gender discrimination, and retaliation claims were correct.[9]

## II. DISCUSSION

---

[8] Because FCRA analysis mirrors that of Title VII, we need not consider the statutes separately. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

[9] Corbett's brief includes Attachments 2a and 2b, which appear to be demonstrative exhibits summarizing trial Exhibits 69, 70, and 135.  It is well settled that the record on appeal is limited to "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk."  Fed. R. App. P. 10(a).  Consequently, we will not consider these attachments to Corbett's appellate brief.

**A. Summary Judgment: Hostile Work Environment**

We review de novo a district judge's granting summary judgment and construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Scant evidence supporting the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be substantial evidence produced for a jury reasonably to find in Corbett's favor. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009).

To establish a hostile work environment claim under Title VII, Corbett must show discriminatory behavior "sufficiently severe or pervasive to alter the conditions of [her] employment." *Pa. State Police v. Suders*, 542 U.S. 129, 133, 124 S. Ct. 2342, 2347 (2004) (citation and internal quotation marks omitted). She must prove:

> (1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee, such as national origin; (4) that the harassment was *sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment*; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

14

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)

(emphasis added); *see Bryant v. CEO DeKalb Co. Jones*, 575 F.3d 1281, 1296 n.

20 (11th Cir. 2009) (recognizing the "same standards of proof" apply in Title VII

and the Equal Protection Clause, 42 U.S.C. § 1981, for discrimination claims

alleging a hostile work environment).

"[T]o be actionable, this behavior must result in both an environment 'that a

reasonable person would find hostile or abusive' and an environment that the

victim 'subjectively perceive[s] . . . to be abusive.'" *Miller*, 277 F.3d at 1276

(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)).

In evaluating the objective severity of the alleged hostile work environment, we

consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3)

whether the conduct is physically threatening or humiliating, or a mere offensive

utterance; and (4) whether the conduct unreasonably interferes with the employee's

job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)

(en banc).  But Title VII is not a general civility code; "ordinary tribulations of the

workplace, such as sporadic use of abusive language, gender-related jokes, and

occasional teasing" cannot form the basis of a claim for actionable harassment or

hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788,

118 S. Ct. 2275, 2284 (1998) (citation and internal quotation marks omitted).

Instead, "conduct must be *extreme to amount to a change in terms and conditions*

15

*of employment*." *Id.*, 118 S. Ct. at 2284 (emphasis added). Title VII "is not a shield against harsh treatment in the workplace"; "[p]ersonal animosity is not the equivalent of [gender] discrimination." *Succar v. Dade Cnty. Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000) (citation and internal quotation marks omitted).

Under these standards, we analyze Corbett's allegations to determine if they rise to the level of a hostile work environment. Corbett asserts she had humiliating and derogatory remarks made to her by her male coworkers in Narcotics; she states she was called "bossy," "bitchy," "abrasive," "dumb," and a "stupid fucking bitch."[10] These comments, however, were isolated and sporadic during the time Corbett worked in Narcotics. She does not represent, and the record does not show, that they were daily occurrences; therefore, they were not sufficiently pervasive to constitute a hostile work environment. Any discord between Corbett and the male Narcotics detectives was the result of personality conflicts, not discriminatory animus. The record also does not support her allegations of being deprived of overtime, training, or other conditions of her work. Significantly, Corbett's employment status as a CCSO Deputy Sheriff was not affected. Viewing all Corbett's allegations in her favor, she has failed to establish a hostile work environment under the controlling law. The district judge correctly granted

---

[10] Corbett also alleges she was asked by Detective Nelson if she wanted to "fuck" on a table while on duty in 2008. This comment was brought to the attention of Lieutenant Abramowitz and sufficiently addressed.

16

summary judgment to Sheriff Beseler on Corbett's claim of hostile work environment.

## B. Judgment as a Matter of Law: Gender Discrimination and Retaliation

The district judge granted the renewed motion for judgment as a matter of law at the close of all the evidence by Sheriff Beseler's counsel, which included Corbett's remaining issues of gender discrimination and retaliation. We review de novo the granting of judgment as a matter of law and apply the same standards as the district judge. *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 956-57 (11th Cir. 2014). A district judge appropriately grants judgment as a matter of law, "when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for [her] on a material element of [her] cause of action." *Id.* at 957 (citation and internal quotation marks omitted). We "consider all the evidence in the light most favorable to the plaintiff and grant the plaintiff the benefit of all reasonable inferences." *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998). We "affirm a judgment as a matter of law only if the facts and inferences point so overwhelmingly in favor of the movant that reasonable people could not arrive at a contrary verdict." *Id.* (citation, internal quotation marks, and ellipsis omitted).

To establish a prima facie case of gender discrimination with circumstantial evidence, Corbett must show (1) she is a member of a protected class; (2) she was

17

qualified for her job; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). To prove an adverse employment action, Corbett "must show a *serious and material* change in the terms, conditions, or privileges of [her] employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). Corbett contends she incurred adverse employment actions when she was transferred to Pharmaceutical Investigations and was denied training and overtime opportunities. As we explained relative to the alleged hostile work environment, the record evidence shows Corbett had the same opportunities as other Narcotics detectives to sign up for overtime; she also had numerous training opportunities, including being certified to dismantle a meth lab, and a transfer without any diminution in salary and title is not an adverse employment opportunity.[11]

Throughout her CCSO employment, Corbett has continued to receive the same compensation, terms, conditions, and privileges of employment as all other deputy sheriffs, commensurate with her position and level of seniority without regard to her gender. Since she has failed to meet the threshold standard for an

---

[11] To the extent Corbett views her separation from Detective Michon as a partner and being given a new partner to be an adverse employment action, she admitted supervising officers have the authority to determine partners in the Narcotics division.

18

adverse employment action by showing a "serious and material" change in her CCSO employment because of her gender, no jury reasonably could conclude she has proved a prima facie case of gender discrimination. The district judge properly granted Sheriff Beseler's motion for judgment as a matter of law on Corbett's claim of gender discrimination.

To establish her claim of retaliation, Corbett must prove she "engaged in statutorily protected activity, [she] suffered a materially adverse action, and there was some causal relation between the two events." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) (citation and internal quotation marks omitted). Corbett's protected activity relates to her gender discrimination complaints with CCSO Human Resources and the EEOC. To the extent she contends the written counseling she received was a retaliatory adverse action, Corbett testified at trial that the counseling did not cause her to lose any pay, benefits or promotional opportunities; it did not affect her job whatsoever. Similarly, Corbett's transfer to Patrol was not a retaliatory adverse action for engaging in protected activity.[12] Corbett was out on self-requested medical leave for surgery for six weeks prior to her transfer to Patrol. When she returned and requested a transfer, the only transfer position available was Patrol. There is no

---

[12] The only possible loss from transferring from Narcotics was $50 pay, which was a clothing allowance to compensate Narcotics detectives for wearing and caring for their own clothes. Corbett does not complain about this pay loss.

19

evidence in the record that her transfer to Patrol was other than voluntary.  A transfer to a different position may be an adverse employment action only if it "involves a reduction in pay, prestige, or responsibility."  *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).  No jury reasonably could conclude any of these work occurrences were retaliatory.  The judge correctly granted Sheriff Beseler's motion for judgment as a matter of law concerning Corbett's retaliation claim.

**AFFIRMED.**