**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-13879

————————————————

MATILDE SANTANA,
  an individual,

*Plaintiff-Appellant,*

*versus*

TELEMUNDO NETWORK GROUP, LLC,
  a Delaware limited liability company,

NBCUNIVERSAL MEDIA, LLC,
  a Delaware limited liability company,

*Defendants-Appellees,*

COMCAST CORPORATION,
  a Pennsylvania corporation,

*Defendant.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-01157-WWB-LHP

————————————————

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

ABUDU, Circuit Judge:

Matilde Santana appeals multiple rulings of the district court arising from her 42 U.S.C. § 2000e ("Title VII") and Florida Civil Rights Act ("FCRA") claims against her former employer.[1] Her lawsuit was based on repeated complaints that she logged regarding sexually charged comments and unwanted physical contact from her supervisor, Anibal Soto, and a permissive, sexualized atmosphere fostered in part by the station's general manager, Luis Roldan. Santana challenges the district court's dismissal of her retaliation claims, the court's grant of summary judgment as to her hostile work environment claim, and the court's denial of her Federal Rule of Civil Procedure 59 motion for reconsideration. After careful review of the record, and with the benefit of oral argument, we reverse the dismissal of the retaliation claims and the grant of summary judgment on the hostile work environment claims, and we remand the case for further proceedings.[2]

---

[1] Santana started working for Telemundo's predecessor entity in or around August 2000, which Telemundo acquired in or around February 2018. Santana's amended complaint names Telemundo Network Group LLC, NBCUniversal as Telemundo's parent company, and Comcast Corporation. Therefore, while some of the allegations Santana presented occurred prior to Telemundo's acquisition, we refer to those sued collectively as "the Defendants."

[2] The district court declined to address the parties' arguments on available damages and, as a general principle, we do not consider issues that were not

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A. The Complaint

Santana originally sued the Defendants in the Middle District of Florida, alleging that they violated Title VII and the FCRA by retaliating against her for engaging in protected activity and by maintaining a hostile work environment based on sexual harassment. According to her initial complaint, in 2000, she began working as an account executive for a television broadcast company, which Telemundo later acquired in February 2018. Santana alleged that starting in October 2014, her manager, Soto, made sexual advances, comments, and jokes toward her. She identified several instances of Soto's alleged sexually inappropriate conduct and claimed that Telemundo's general manager, Roldan, consistently encouraged Soto's mistreatment of female employees.

In connection with her retaliation claims, Santana's complaint alleged that the Defendants violated Title VII by retaliating against her for engaging in protected activity or expression. She identified this protected activity as opposing the Defendants' sexually discriminatory practices, reporting sexual discrimination and

---

decided below. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *see also Jackson Nat'l Life Ins. v. Crum*, 54 F.4th 1312, 1314 (11th Cir. 2022) (declining to consider an issue on appeal that the district court expressly chose not to address).

We need not address Santana's Rule 59 motion because we are vacating and remanding on the issues she raised in that motion. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

participating in an investigation into their conduct, and filing a charge with the Equal Employment Opportunity Commission ("EEOC"). Santana claimed that she experienced adverse employment actions, including losing several accounts, being denied compensation entitlements, having her leave request for medical accommodations denied, and facing hostility upon returning from medical leave. She further asserted that there was a causal connection between the protected activity and the adverse actions, contending that the Defendants were aware of her protected conduct and took the adverse actions shortly thereafter.

The Defendants moved to dismiss the entire complaint, arguing first that it constituted an impermissible shotgun pleading because it incorporated all factual allegations into each count and contained numerous immaterial and conclusory allegations. In the alternative, they sought dismissal of the retaliation counts, asserting that Santana failed to identify what protected activity she engaged in, that any theory premised on the denial of medical leave was not actionable, and that she did not allege that any decisionmakers were aware of her protected activity or plausibly plead a causal connection.[3]

The district court granted their motion in part. It rejected the shotgun-pleading challenge, concluding that although the complaint incorporated factual allegations into each count, it was not

---

[3] Defendants also argued that Telemundo could not be held liable under a successor-liability theory for conduct predating its 2018 acquisition.

22-13879                Opinion of the Court                5

so confusing as to preclude a responsive pleading.[4]  However, the court dismissed the retaliation claims (Counts II and IV), without prejudice, because the allegations were conclusory, did not plead facts showing that the relevant decisionmakers were aware of Santana's protected activity, and lacked sufficient allegations establishing temporal proximity.

Santana then filed an amended complaint, asserting that in retaliation for rejecting Soto's repeated sexual advances between November 2017 and October 2018, he reassigned one of her largest accounts in early 2018 and subsequently refused to adjust her sales budget to account for the lost account.  She further alleged that when she took leave in October 2018 for spinal surgery following a car accident, Soto temporarily managed her accounts but continued to contact her, demanding she remain involved with her clients and effectively requiring her to work despite being on leave.  Santana also stated that her counsel sent the Defendants letters on December 3, 2018, and April 11, 2019, notifying them of Soto's conduct, which prompted the Defendants to initiate what she described as a "purported investigation."

Throughout the amended complaint, Santana refers to Soto, Roldan, and "the Defendants" as the ones who took various adverse actions against her.  She alleged that, after the Defendants

---

[4] The court likewise declined to dismiss on successor-liability grounds, finding that Santana was seeking to hold Telemundo liable only for conduct occurring after it became her employer and that she was not attempting to assert liability for pre-acquisition events.

6                    Opinion of the Court                    22-13879

began their investigation, Soto and Roldan, whom she described as her direct supervisors, openly discussed the matter in the office despite policies designed to protect the anonymity of employees reporting misconduct. She further stated that upon requesting a reasonable accommodation around June 25, 2019, following her surgery—a request she previously had been routinely granted, the Defendants denied her request, delayed her return to work unnecessarily, and questioned her dedication to her job. Santana claimed that when she resumed working in the office, her supervisors directed other employees to limit interactions with her as both punishment and a warning to discourage similar protected activity. She also alleged that the Defendants made several last-minute changes to her performance metrics to reduce her productivity in response to her counsel's letters and her continued refusal to comply with Soto's sexual demands.

In the counts addressing her retaliation claims, Santana's amended complaint incorporated the allegations described above along with additional claims. She specifically identified her protected activities as: (1) opposing Defendants' sexually discriminatory practices; (2) accusing Defendants of sexual discrimination and participating in an investigation into the same; and (3) filing a charge against Defendants with the EEOC. She maintained that her superiors, alleged as being Soto and Roldan, were aware of this protected activity. In retaliation for engaging in protected activity, she alleged that she experienced adverse employment actions, including the loss of several accounts, deprival of compensation entitlements, refusal to accommodate her while on medical leave,

and being treated with hostility upon her return from leave. She further alleged a causal connection between her protected activity and the adverse actions, asserting that the Defendants were aware of her protected conduct and took the adverse actions shortly, thereafter, attempting to punish or otherwise discourage her and others from engaging in such activity.

The Defendants renewed their motion to dismiss the retaliation claims with prejudice (Counts II and IV) for failure to state a claim, presenting many of the same arguments they raised earlier. The district court granted the Defendants' motion and, this time, did dismiss the claims with prejudice. The court again found the allegations to be too conclusory and that she failed to allege:

> when she requested a reasonable accommodation, from whom and if that person had knowledge of her protected activity . . . [W]ho was responsible for delaying her return to work . . . who made negative comments regarding her dedication to her job, what knowledge that individual had regarding her protected activities, or when such comments were made; what "superiors" instructed other employees to treat her poorly or what knowledge those persons had; . . . and . . . who was responsible for adjusting [her] performance statistics, when that action was taken, or what that person . . . knew regarding her protected activity.

The court further found that Santana's allegations regarding her superiors' or the Defendants' knowledge were "nothing more than threadbare, conclusory recitations of the elements, which is

patently insufficient to meet the pleading burden." The court also determined that to the extent Santana relied on temporal proximity to establish a causal link, the amended complaint failed to allege that the timing of the adverse actions was sufficiently close to her engagement in protected activities.

## B. The Summary Judgment Proceedings

During her deposition, Santana described a single incident that occurred between June and August 2019 in which Soto allegedly reached over her chair, pulled up her skirt, and grabbed a pen from her desk. She also identified many comments Soto made that she viewed as inappropriate.

After her deposition, Santana signed an affidavit wherein she stated that Soto often would stare at her breasts and make comments about her clothing, such as suggesting it was either too revealing or not revealing enough. She also alleged that he made daily and persistent remarks about how much he enjoyed looking at her breasts and rear. While the frequency of these comments somewhat decreased after Soto and her husband became friends, she maintained that he never refrained from making similar comments about other employees in her presence.

Santana's affidavit further detailed how Soto regularly commented about women he believed were prostitutes, including which ones were "horrible" and which "looked good enough," and frequently used sexualized double entendres such as "market penetration." According to Santana, he also made inappropriate remarks to and about other female employees. For instance, she

stated that Soto once told her another employee was sitting at her desk in a way that allowed him to see up her skirt, and that he referred to a different female employee as a "crazy bitch" and said her clothing "made her look like a prostitute." Santana further believed that Soto had a sexual relationship with another female employee, whom he consistently rewarded with business leads and overlooked behaviors for which others would be reprimanded. She also noted that a former general manager apparently believed Soto was involved with this employee, based on Soto telling Santana that the manager had questioned him about whether he and the employee were engaging in sexual intercourse.

In addition, Soto apparently once commented on her conservative outfit and told her an inappropriate story about a teacher with whom he wanted to have sexual relations. He later told Santana that if she saw him with "'curly hair on top' [of his head] it's only because he had pulled it from his pubic hair and [he] then pantomimed plucking his pubic hair and placing it atop his head." In August 2018, after "st[i]ck[ing] his tongue out and lick[ing] his lips in a suggestive manner," he began massaging her. When she tried to shrug him off of her, he stated that he had to stop because "it was getting hard." In October 2018, Soto, referencing his office, asked Santana, "'can you come in, or do I need to 'cum' in you?'"

Soto called Santana while she was on medical leave, and when she explained that she was in too much pain to work, he told her "to go to bed and take [her] laptop and spread [her] legs'" like she "'kn[ew] how to do.'" She alleged that Soto continued making

degrading and humiliating comments about her appearance despite his friendship with her husband, and made clear that he would retaliate against anyone who displeased him. For example, Santana claimed that after Soto learned a woman with whom he allegedly had a sexual relationship complained to HR, he told Santana he would get back at her by raising her budget, which subsequently increased significantly. Similarly, whenever Santana rejected Soto's advances or responded negatively to his harassment, he would reassign her accounts and refuse to adjust her budget, forcing her to work harder to compensate for the resulting loss of billing.

Santana returned to work from medical leave on or about June 25, 2019. She alleged that Soto continued to verbally and physically harass her even though he was aware she had lodged complaints against him. She described instances in which he repeatedly encroached on her personal space and placed her in uncomfortable physical situations, asserting that he purposefully made repeated physical contact to signal that he could act without consequence. According to Santana, Defendants allowed Soto to remain her manager until August 2019, despite her allegations. Even after a new manager replaced Soto, he allegedly continued to create daily opportunities to call her into his office or approach her desk, making her uncomfortable through physical contact.

Santana also swore that Roldan consistently contributed to the harassment and the creation of a hostile work environment by (1) "regularly ma[king] inappropriate comments regarding 'sexy'

women" "and stating that the more revealing their clothing is, the better"; (2) "rubbing the arms" of another female employee who later told Santana that "she did not like being touched by" Roldan; and (3) "skipping over" Santana during sales meetings because she did not acquiesce "to the crude comments" nor engage "in the flirtation and sexual favors that some of [her] co-workers did." Santana also recounted that Roldan made remarks to Soto about her in a manner suggesting familiarity that was inappropriate for the workplace, using a Spanish term commonly employed to refer to a romantic partner or close accomplice. Before her medical leave, Roldan told Santana that if Defendants' HR department received complaints about someone he liked, he would inform that person about the complaint. Having personally observed management retaliate against employees who raised concerns and given Defendants' failure to address her own complaints about Soto's handling of her accounts, Santana explained that she had little confidence in the company's internal reporting process and instead reported Soto's misconduct to NBCUniversal, through counsel, in April 2019.

After NBCUniversal received the letter from Santana's counsel, Patty Lewis, the HR director of an NBCUniversal subsidiary and Telemundo sister company, began a month-long investigation. Lewis testified that during the course of the investigation, she interviewed Santana, Soto, Roldan, and various members of the sales team and news department. Although none of the employees Lewis interviewed had personally witnessed Soto touch Santana or speak inappropriately to her, several agreed that he sometimes

acted inappropriately towards female employees. For example, the Director of Creative Services told Lewis that Soto expressed favoritism towards the female employee with whom he allegedly had a sexual relationship, and an account executive confirmed that Santana had shared with him multiple incidents of inappropriate sexual behavior by Soto, consistent with the examples she provided. That same account executive reported further that Soto demonstrated favoritism by assigning leads to certain employees, and another interviewee explained that "[s]ometimes things are said . . . that may not be appropriate for work, but [that] might be because of Hispanic culture . . . ."

Regarding her interview with Santana, Lewis acknowledged that if Soto behaved as Santana described, then he had indeed violated Defendants' sexual harassment policies. Although Lewis considered Santana to be credible, she also accepted as true Soto's account regarding his interactions with Santana without independently verifying his version of events. For example, Lewis never requested, let alone reviewed, documents pertaining to Soto's handling of Santana's clients and, instead, accepted his assertion that he had adequately serviced Santana's clients while she was on leave. Lewis also requested that Soto provide a copy of text messages he and Santana exchanged, but Soto never supplied those documents. In addition, Lewis found Soto, who denied ever touching Santana's thigh, to be more credible than Santana even though there were no other witnesses to corroborate either side's story regarding the alleged incident. During her deposition, Lewis reiterated that she did not think Santana fabricated her allegations; she

maintained that conduct could only be considered a violation of Defendants' sexual harassment policies if "if you become aware of it . . . you look into it, and it's been corroborated."

Lewis' investigation into Roldan confirmed that many people witnessed him spending a great deal of time with a female employee others accused him of favoring. Lewis admitted that, despite receiving those reports, she never asked Roldan or the female employee about their purported relationship. Lewis also acknowledged that she did not attempt to determine whether any other employees had complained about Roldan prior to interviewing him. Following her investigation, Lewis concluded that "there had not been any form of sexual harassment or inappropriate touching." Lewis recommended that Defendants consider additional respect-in-the-workplace training and potentially reassigning Soto to a different role, explaining that several members of the sales team had indicated he was not the best fit.

Following discovery, the Defendants moved for summary judgment on Santana's remaining sexual harassment and hostile work environment claims. First, they argued that any treatment Santana received was not so severe or pervasive such that it altered the terms and conditions of her employment. According to the Defendants, Santana only identified: (a) a single instance in which Soto purportedly touched her; and (b) a limited number of discrete comments that occurred during the "relevant time period"—after November 1, 2018, which she had identified as the earliest date of discrimination on her EEOC charge form. Second, they argued

that Santana could not succeed against them on a vicarious liability or direct liability theory because Soto was never her "supervisor" as required under Title VII. They maintained that a vicarious liability claim necessarily would require proof that Soto was her supervisor, which she had failed to present; and direct liability would require additional evidence that they were aware of the sexual harassment and did nothing about it. Defendants argued that she did not meet her burden of proof and did not raise a genuine question of material fact as to Soto's role.

Third, the Defendants asserted that even if Soto was Santana's supervisor, the record already showed that they exercised reasonable care to prevent and promptly correct the harassment; and Santana should have, and did not, avail herself of opportunities to improve the situation. In support of this position, the Defendants point to anti-harassment policies they adopted and the fact that they began investigating Santana's complaints soon after receiving the April 2019 letter counsel first sent. They further contend that Santana never reported Soto to their Human Resources department ("HR"), as the anti-harassment policy directed.

Santana opposed the Defendants' motion and argued there were several issues of material fact that warranted a trial. In particular, she argued that a jury could find that Soto and Roldan, based on the nature of her position, did exercise authority over her to support both a vicarious liability and direct liability claim. In the alternative, she argued that, if nothing else, the Defendants were negligent in that they were aware of the sexual misconduct and

failed to take the necessary steps to improve her working conditions. She also highlighted that her allegations of sexual harassment pertained to behavior that occurred before and after 2018, so all those instances of misconduct had to be considered for purposes of establishing the severity and pervasiveness of the harassment she experienced.

Defendants, she argued, maintained an ineffective anti-harassment policy and did not meaningfully investigate or take remedial steps in response to her complaints. Therefore, she contended, they could not rely on any policy-based affirmative defenses to her claims of ongoing harassment.

After considering the evidence in the record, the district court granted the Defendants' summary judgment motion on three independent bases. First, the district court determined that Santana failed to present sufficient evidence from which a jury could find that Soto's or Roldan's conduct qualified as sufficiently severe or pervasive such that it altered the terms of her employment. Specifically, as to the pervasiveness of the conduct, the court noted that Santana identified only a handful of instances where Soto touched her or made comments directed at her, and only a few remarks by Roldan, most of which were about others. On severity, the court found that neither Soto's nor Roldan's behavior rose to the level of being "sufficiently threatening or humiliating." The court characterized most of Soto's conduct as inappropriate jokes or sexual innuendos and determined that the touching incidents were not severe enough to meet the legal threshold. It also

concluded that, even accepting Santana's newly asserted claim in her affidavit that Soto brushed up against her after she returned from leave, that conduct appeared retaliatory rather than based on sex and, therefore, was not part of her sexual harassment claim.

Alternatively, the court determined that even if the conduct qualified as sufficiently severe or pervasive, Santana failed to establish a basis for liability. The court found that Soto did not qualify as Santana's supervisor for purposes of Title VII because he lacked the authority to take tangible employment actions against her, which meant that the Defendants could not be vicariously liable for his conduct. The court further found that Santana could not hold the Defendants directly liable under a negligence theory because she failed to present evidence showing that the Defendants had actual or constructive notice of Soto's misconduct and failed to take appropriate corrective action. The court reasoned that once the Defendants received notice of Soto's alleged behavior through Santana's April 2019 letter, they promptly investigated, and there was no evidence that Santana alerted them to any further conduct after she returned to work in June 2019.

As for Roldan, the court found that there was no evidence that his conduct was directed at Santana, and the behavior she observed was neither severe nor frequent enough to be pervasive. The court further explained that, even assuming Roldan qualified as her supervisor, an employer may avoid liability by showing that (1) it exercised reasonable care to prevent and correct harassment, and (2) that the employee unreasonably failed to take advantage of

preventative or corrective opportunities. The court determined that the defendants met the first prong by maintaining an anti-harassment policy, providing training, and promptly investigating Santana's complaints. With respect to the second prong, the court concluded that Santana waited over a year to report the alleged harassment, and her fears of reprisal did not excuse that delay. As there was no genuine dispute that the alleged conduct was not severe or pervasive, and that Defendants had an adequate anti-harassment reporting policy that Santana opted not to follow, the court granted summary judgment for the Defendants and did not address the issue of damages.

## II. STANDARDS OF REVIEW

We review dismissal for failure to state a claim *de novo*, taking all allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *See Henderson v. McMurray*, 987 F.3d 997, 1001 (11th Cir. 2021). Similarly, summary judgment rulings are reviewed *de novo*, applying the same legal standard as the district court, and drawing all reasonable inferences in favor of the non-moving party; summary judgment is proper only if no genuine dispute of material fact exists. *See Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017); *see also Guevara v. Lafise Corp.*, 127 F.4th 824, 828 (11th Cir. 2025). Finally, we review a district court's denial of a Rule 59 motion for abuse of discretion. *See Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007); *see also Guevara*, 127 F.4th at 829.

## III. DISCUSSION

Santana challenges the district court's ruling as to two of her central claims: retaliation for engaging in protected activity and maintaining a hostile work environment based on sexual harassment. We address each in turn.

### A. *The District Court Erred in Dismissing Santana's Retaliation Claims.*

Santana argues that the district court erred in dismissing her retaliation claims at the pleading stage. She contends that her amended complaint sufficiently alleged that, after she reported sexual harassment to the HR department in April 2019, Defendants retaliated by reassigning her accounts, delaying her return from medical leave, and isolating her upon her return to work in June 2019. Although the issue presents a close question, we agree with Santana that the amended complaint plausibly pleads retaliatory conduct, and dismissal was thus improper.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Besides containing well-pleaded factual allegations, a complaint must also meet the "plausibility standard" the Supreme Court set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To withstand a motion to dismiss, a complaint must include sufficient factual matter, taken as true, to state a claim for relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678 (quotation marks and citation omitted). A claim is facially plausible when the plaintiff alleges facts that allow

the court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* The plausibility standard is not a probability requirement; rather, it requires more than a mere possibility that the defendant has acted unlawfully. *Id.* (quoting *Twombly*, 550 U.S. at 556). Although courts must accept factual allegations as true, that principle does not extend to legal conclusions. *Id.* Allegations consisting only of "[t]hreadbare recitals of the elements of a cause of action" or conclusory statements are insufficient. *Id.* Assessing plausibility is a context-specific task that requires the court to draw on its "judicial experience and common sense." *Id.* at 679.

Title VII prohibits employers from retaliating against an employee because she "has opposed any practice made an unlawful employment practice" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). To establish a prima facie case retaliation claim, a plaintiff must allege facts showing that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse employment action, and (3) there was a causal connection between the two. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023); *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

Among these elements, causation is often dispositive. *See e.g., Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121 (11th Cir. 2020) (*en banc*) (affirming summary judgment for employer where plaintiff failed to show causal connection between protected activity and adverse action). To establish causation, a plaintiff must

plausibly allege facts that would show "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bell-South Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53(2006). The Supreme Court has clarified that a Title VII retaliation claim requires "but-for" causation—meaning that retaliation must be the determinative reason for the adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *see also Gogel*, 967 F.3d at 1135. The burden of alleging causation can be satisfied by factual allegations showing close temporal proximity between the protected activity and the adverse employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). We additionally have established that at summary judgment, "mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal citations omitted)).[5]

---

[5] In dismissing Santana's retaliation claims, the district court evaluated causation by citing to several of our decisions arising at summary judgment. *See, e.g., Thomas*, 506 F.3d at 1361; *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318 (11th Cir. 2020); *Faircloth v. Herkel Invs.*, 514 F. App'x 848 (11th Cir. 2013) (unpublished). Those authorities address whether the evidence adduced at summary judgment permits a reasonable jury to infer causation; they do not supplant the Rule 12(b)(6) plausibility inquiry. It is often appropriate to consider timing and context at the pleading stage, but courts must take care not to conflate the sufficiency of pleaded facts with the sufficiency of evidentiary proof.

Taking the factual allegations as true, Santana's amended complaint plausibly alleged each element. She unquestionably engaged in protected activity by reporting harassment both internally and through her attorney's April 2019 letter to the Defendants. Complaints to an employer's HR department or counsel are protected under Section 2000e–3(a) if the employee has a good faith, reasonable belief that discrimination occurred. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). Santana's complaint detailed ongoing sexual remarks, unwanted contact, and gender-based hostility, well within the scope of Title VII-protected opposition.

Santana also plausibly alleged materially adverse actions—those that might dissuade a reasonable employee from engaging in protected activity. *See Burlington*, 548 U.S. at 68. She claims that after her complaint, management reassigned lucrative accounts, reduced her sales budget, directed coworkers to avoid her, and delayed accommodations following her surgery. These alleged acts, if motivated by retaliation, qualify as adverse actions.

The district court erred in concluding that the complaint failed to plausibly allege causation. At the pleading stage, Santana needed only to plead facts supporting a reasonable inference that the persons responsible for the adverse employment decisions were aware of her protected activity and acted because of it. *See Shannon*, 292 F.3d at 716. Specifically, her "factual allegations, when assumed to be true, 'must be enough to raise a right to relief above the speculative level.'" *Mills v. Foremost Ins. Co.*, 511 F.3d

22                    Opinion of the Court                    22-13879

1300, 1303 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555). Further, a complaint facing a Rule 12(b)(6) motion does not need to lay out extensive factual detail, but the plaintiff must still provide enough factual content to show why they are entitled to relief. *Id.* Mere labels, conclusory statements, or a simple recitation of the elements of a cause of action are not sufficient. *Id.* Santana's amended complaint satisfies these prerequisites.

First, the complaint sufficiently identified the individuals involved in the adverse employment actions. At the pleading stage, courts require at least a factual basis for inferring that the decisionmakers acted in retaliation. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (plaintiff must provide enough factual content to raise a plausible claim), *overruled in part by Twombly*, 550 U.S. 554. Santana refers to her superiors generally as "the Defendants" throughout the amended complaint.[6] While these general assertions would not be enough on their own, she does identify the relevant decisionmakers and claims they were aware of the protected activity. She specifically stated that Soto "re-assigned several of

[6] Santana was represented by counsel and therefore is not entitled to the liberal construction afforded to *pro se* pleadings. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). While her counsel's identification of the relevant decisionmakers was not a model of specificity, the amended complaint nonetheless provided enough factual content—naming Soto and Roldan, describing their awareness of her protected activity, and linking their actions to adverse employment consequences—to make a plausible claim at the motion-to-dismiss stage. *See Doe v. Samford Univ.*, 29 F.4th 675 (11th Cir. 2022) (Jordan, J. concurring) ("Title IX plaintiffs need only allege facts that would allow us to infer a plausible claim of sex discrimination.").

[her] accounts, that "[d]ue to these re-assignments, [she] lost over $525,000 in business"; and that "Soto re-assigned these clients in retaliation for [her] rebuffing his sexual advances." She additionally noted that after she returned to work, "during office meetings, Mr. Roldan, as punishment for, and as a clear message intended to discourage others from attempting to exercise the legal right to a discrimination free workplace, would intentionally skip over [her] during the question and answer period." In these examples, Santana identified the specific decisionmakers, Soto and Roldan.

Second, the complaint plausibly alleged that the individuals responsible for the adverse account or budget decisions were aware of Santana's protected activity. To infer retaliation, the decisionmaker must know that the employee engaged in protected conduct. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Santana alleged that after she filed her complaints, Soto and Roldan discussed the ongoing investigation openly in the office. She additionally noted that her superiors were aware of her protected activity. These allegations are further supported by specific examples showing that Soto and Roldan not only made adverse employment decisions but did so with knowledge of her protected activity. The reassignment of accounts by Soto and the intentional skipping over Santana during meetings provide concrete instances from which a factfinder could infer that the decisionmakers were aware of and motivated by her protected activity.

Third, the complaint plausibly alleged temporal proximity between the protected activity and adverse actions. Santana

reported Soto's misconduct to NBCUniversal, through counsel, in April 2019, and the alleged reassignments and budget changes occurred just two months later, on June 24, 2019. For purposes of summary judgment, we have found that a two-and-a-half-month period is sufficiently close to create a material issue of fact on causation. *See Thomas*, 506 F.3d at 1364; *see also Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1328 (11th Cir. 2020). It is noteworthy that Santana had been on medical leave since October 2018. *See Thomas*, 506 F.3d at 1364. So, while the April to June 2019 timeline in and of itself is short, the timing also reasonably casts doubt on why the Defendants would choose after April, when she filed the complaint, to make such major decisions concerning her employment.

These facts distinguish this case from the unpublished opinion in *Greene v. Alabama. Dep't of Revenue*, 746 F. App'x 929 (11th Cir. 2018) (unpublished), upon which the district court relied.[7] In *Greene*, the plaintiff alleged that his new employer terminated him in retaliation for EEOC complaints filed against a prior employer. 746 F. App'x at 931. We affirmed the dismissal, holding that Greene failed to identify any specific decisionmaker with knowledge of the protected activity and failed to allege how or

---

[7] "Unpublished decisions are not binding authority and they are 'persuasive only to the extent that a subsequent panel finds the rationale expressed in that opinion to be persuasive after an independent consideration of the legal issue.'" *Collado v. J. & G. Transp., Inc.*, 820 F.3d 1256, 1259 n.3 (11th Cir. 2016) (quoting *Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1260 n.3 (11th Cir. 2007)).

when decisionmakers learned of his EEOC charges, and relied primarily on temporal proximity—nearly eight months—which was insufficient to support a plausible inference of causation. *Id.* at 931–32. Unlike the plaintiff in *Greene*, Santana identified the relevant decisionmakers, demonstrated their awareness, and provided evidence of a sufficiently close temporal link, one that was significantly shorter than eight months. *Id.*

Finally, the complaint plausibly alleged retaliatory intent through the narrative as a whole. The reassignment of Santana's accounts, the reduction of her budget, and the directive that coworkers avoid her occurred only after she complained. The allegations describe a sudden and negative shift in her working conditions following the report—precisely the type of retaliatory sequence Title VII prohibits.

Nor does *Nassar* foreclose Santana's claim. 570 U.S. at 352. She alleged that these adverse actions would not have occurred but for her complaint, and the surrounding factual allegations permit that inference. The complaint portrays the challenged decisions as a departure from her prior treatment and as a coordinated response to her protected activity—not merely a continuation of prior harassment. At the pleading stage, that is enough. Taking the factual allegations as true and drawing reasonable inferences in Santana's favor—as the Rule 12(b)(6) standard requires—the amended complaint plausibly alleged that individuals with authority over her employment took adverse actions because she engaged in protected

activity. The district court therefore erred in dismissing the retaliation claims at the pleading stage.

### B. The District Court Erred in Granting Summary Judgment Based on Santana's Hostile Work Environment Claim.

We next conclude that the district court erred in its grant of summary judgment to the Defendants on Santana's hostile work environment claims. Evaluated in the light most favorable to Santana, the evidence demonstrates genuine disputes of material fact regarding whether she suffered sex-based harassment that was sufficiently severe or pervasive to alter the terms and conditions of her employment, and whether the Defendants failed to take appropriate remedial action.

Summary judgment is warranted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when the evidence is sufficient that a reasonable jury could find in favor of the nonmoving party." *See Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir. 2022). As assessing credibility, weighing the evidence, and drawing reasonable inferences are responsibilities for the jury rather than the court, the evidence presented by the nonmoving party must be accepted as true, and all reasonable inferences must be drawn in their favor. *Id.* Claims of racially hostile work environments under Section 1981 are judged by the same standard we applied to claims under Title VII. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1334 (11th Cir. 2023).

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  It prohibits "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

To establish a hostile work environment based on sexual harassment, an employee must demonstrate that: (1) she suffered harassment based on sex;[8] (2) the harassment was sufficiently severe or pervasive to alter the terms and conditions of the employment; and (3) the employer is liable for that environment, either vicariously or directly. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *see also Pennsylvania State Police v. Suders*, 542 U.S. 129, 133 (2004).  Consideration of whether the alleged misconduct is sufficiently severe or pervasive involves both an objective and a subjective analysis. *Miller*, 277 F.3d at 1276; *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009).  Thus, the "behavior must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive." *Miller*, 277 F.3d at 1276 (quoting *Harris*, 510 U.S. at 21–22).

We have adopted a "totality of the circumstances" approach to considering the objective severity of the harassment, which

---

[8] Santana, as a female employee, indisputably belongs to a protected class. There is no dispute on this element.

turns on several factors, including: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*; *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*) (same). These factors are neither rigid elements nor requirements, but rather "guide our inquiry." *Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024); *see also Fernandez v. Trees, Inc.*, 961 F.3d 1148 (11th Cir. 2020) (quoting *Harris*, 510 U.S. at 23) ("The Supreme Court has emphasized that "no single factor" is necessary to satisfy the objective inquiry of a hostile work environment claim.").

The objective element of the severe or pervasive inquiry is not measured with mathematical precision but is evaluated based on the surrounding circumstances and the context in which the conduct occurred. *See Bryant*, 575 F.3d at 1296–97 (explaining that the severe-or-pervasive analysis is a "fact-intensive" inquiry assessed under the totality of the circumstances, including the frequency, severity, and contextual setting of the challenged conduct); *see also Copeland*, 97 F.4th at 775–78 (explaining that persistent humiliating and insulting behavior, as well as authority-undermining conduct—particularly when it occurs daily and involves both coworkers and supervisors—can readily satisfy the severe-or-pervasive standard under a contextual, fact-intensive inquiry). The inquiry is, thus context-specific. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding

circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

### 1. Allegations of Sexual Harassment

Santana presented evidence that Soto engaged in repeated sexualized conduct, including physical contact, comments on her appearance, and sexual advances, both before and after she complained. The conduct was frequent and pervasive, extending beyond isolated incidents[9] to near-daily inappropriate interactions. Santana described feeling humiliated, anxious, and uncomfortable, reflecting her subjective experience of harassment. Soto also repeatedly made sexually explicit comments, engaged in unwanted physical contact, and encroached upon Santana's personal space, including putting his arm around her waist and grazing her leg. The record evidence, viewed in the light most favorable to Santana, creates a genuine dispute of material fact as to whether she was subjected to severe or pervasive harassment because of her sex. A reasonable jury could find that the conduct she describes—including repeated derogatory and inappropriate comments, even

---

[9] Unlike the harassment in *Mendoza*, which involved a few isolated incidents, including minimal physical contact, brief "sniffing" gestures, and the supervisor's occasional staring, Santana endured repeated, near-daily sexually inappropriate comments, propositions, and physical interactions. 195 F.3d at 1247. Multiple former employees corroborated the pervasive nature of the harassment. Moreover, Santana experienced ongoing misconduct after filing her complaint, further demonstrating both the severity and pervasiveness of the harassment.

when framed as "jokes," and treatment not directed at male employees—was offensive and discriminatory. A jury could likewise conclude that Roldan's sexually suggestive comments toward other employees, together with his tolerance of Soto's harassment, contributed to a discriminatory work environment.

A jury also could decide that the conduct was not limited to a few isolated incidents but rather evidenced repeated sexualized conduct and its cumulative effect over time. A jury additionally could conclude that the post-leave incidents were not exclusively retaliatory, as the district court found, but also a form of sex-based harassment, making them a part of the totality of the circumstances the court was required to consider under Title VII. As such, genuine disputes of material fact remain as to this element.

## 2. Terms and Conditions of Employment

The district court concluded that the instances of touching and inappropriate comments, taken together, did not rise to the level of severity or pervasiveness necessary to establish a hostile work environment claim. However, viewing the totality of the circumstances in Santana's favor, as *Miller* requires, a reasonable jury could find otherwise. 277 F.3d at 1276. Considering all evidence relevant to Santana's claim, both the pre- and post-notice incidents of harassment, a jury could conclude that the harassment she endured was sufficiently severe or pervasive to alter the terms and conditions of her employment. *Id.*

Santana's affidavit and deposition testimony describe repeated and escalating harassment that spanned multiple years, both

before and after the Defendants acquired her former employer.[10] Soto made frequent and explicit comments about Santana's body and appearance, shared sexualized stories in her presence, and initiated unwanted physical contact, including placing his arm around her waist, grazing her leg, and standing in her personal space despite her clear objections. Santana testified that this conduct occurred on an almost daily basis, creating an environment she described as "degrading and humiliating." Such repeated and targeted conduct is precisely the type of pervasive behavior that satisfies the frequency and severity components of the inquiry. *See Miller*, 277 F.3d at 1276–77 (explaining that repeated, targeted harassment, such as frequent offensive comments and unwanted physical contact, can satisfy the frequency and severity components of a hostile work environment claim, particularly when considered under the totality of the circumstances).

As to the objective component, a reasonable person in Santana's position could likewise find the conduct hostile or abusive. *See Bryant*, 575 F.3d at 1297 (explaining that the objective element

---

[10] Santana also sought to introduce statements from two of her former colleagues that she contended would corroborate various events that she had described in her own affidavit to her Rule 59 motion. However, as the district court correctly observed, courts have broad discretion to reconsider prior decisions and a "Rule 59(e) motion [cannot be used] to relitigate old matters, raise arguments or present evidence that could have been raised prior to the entry of judgment." *Arthur v. King*, 500 F.3d 1335 (11th Cir. 2007) (quoting *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)). Accordingly, this evidence is not properly before us and cannot be considered.

of a hostile work environment claim is evaluated based on the totality of the circumstances to determine whether a reasonable person in the plaintiff's position would find the conduct hostile or abusive). The record evidence, when viewed in Santana's favor, could support a finding that the harassment was frequent, occurring nearly every day over an extended period. A reasonable jury could additionally conclude that the conduct was not limited to offhand remarks but included repeated, unwanted physical contact, satisfying the severity factor even absent physical assault or threats. *See Miller*, 277 F.3d at 1276 (noting that repeated, targeted harassment, including verbal abuse and unwelcome physical contact, can satisfy the severity and frequency elements of a hostile work environment claim, even without physical assault or threats). The record additionally could support a finding that the conduct was not merely offensive; Santana described it as humiliating and degrading, and the record supports that characterization, particularly because Soto continued his behavior after she complained—conduct that could reasonably be viewed as intended to assert dominance and discourage further reporting. *See Copeland*, 97 F.4th at 777 (plaintiff's credible testimony that harassment occurred nearly every day supports finding the conduct was frequent and severe). Moreover, a reasonable jury could conclude that the sexually charged environment was reinforced by Roldan, who tolerated Soto's conduct and himself made sexually suggestive remarks in the workplace. As such, a jury could find that the combined effect of these behaviors created an environment that was not merely uncomfortable but actively degrading and exclusionary toward Santana as a woman.

A reasonable jury could additionally conclude that the harassment interfered with Santana's ability to perform her job effectively. She testified that after rebuffing Soto's advances, she faced reduced budgets, lost accounts, and reputational harm requiring her to "work harder" to recover lost business. evidence suffices to show that the harassment could be viewed as unreasonably interfering with her job performance. *See Miller*, 277 F.3d at 1276 (recognizing that harassment need not produce tangible effects on job performance to satisfy the objective severity inquiry, but evidence that the conduct unreasonably interfered with the employee's ability to perform duties supports a hostile work environment claim).

The district court's refusal to consider the post-leave incidents of harassment, reasoning that they were "motivated by retaliation rather than sex," was also incorrect. A jury could conclude that the Defendants received actual notice of Soto's prior harassment in April 2019 yet left him in place as Santana's manager when she returned from medical leave. Santana's affidavit describes that after her return, Soto continued his harassment, including repeated physical contact, despite knowing she had complained. A jury could reasonably infer that this post-notice conduct was at least partly motivated by the same sex-based hostility that had characterized his earlier behavior. *See Edmondson,* 43 F.4th at 1159 (explaining that whether a defendant's conduct was motivated by the same wrongful animus as earlier acts is a question of fact for the jury and cannot be resolved at summary judgment). Excluding these incidents from the hostile work environment analysis was in error, as they form part of the continuous pattern of sex-based

mistreatment that a reasonable person would find hostile or abusive. *See Miller*, 277 F.3d at 1276–77 (recognizing that repeated, unwanted conduct contributes to a continuous pattern of harassment and should be considered as part of the overall hostile work environment).

Viewed together, the pre- and post-notice conduct depicts an environment in which Santana was subjected to persistent, humiliating, and intimidating treatment that materially altered the conditions of her employment. Her affidavit satisfies the subjective component by describing her humiliation and distress, while the objective evidence supports a finding that the harassment was sufficiently severe or pervasive under controlling precedent. *See Miller*, 277 F.3d at 1275–77 (finding that repeated, humiliating, and degrading ethnic harassment that was pervasive in the workplace satisfied both the objective and subjective components of a hostile work environment claim); *see also Bryant*, 575 F.3d at 1297 (explaining that whether conduct is severe or pervasive is evaluated under the totality of the circumstances and in context, and that objective evidence of harassment can support a finding of a hostile work environment). A reasonable jury could thus conclude that the harassment Santana endured altered the terms and conditions of her employment, rendering summary judgment improper.

### 3. Employer Liability

Santana presented evidence that both Soto and Roldan exercised authority over her work, including control over her client accounts, budgets, and sales targets. They could alter her

assignments and affect her compensation, which qualifies as "tangible employment actions" under *Vance v. Ball State University*, 570 U.S. 421, 431 (2013) (explaining that an employee is a supervisor for Title VII purposes only if empowered to take tangible employment actions such as hiring, firing, or reassigning with significant consequence). On these facts, a reasonable jury could conclude that they were supervisors within the meaning of Title VII, rendering the Defendants vicariously liable for the hostile work environment they created or condoned. *See id.* at 424 (holding that an employee is a "supervisor" for purposes of vicarious liability under Title VII only if empowered to take tangible employment actions, and that authority over day-to-day tasks alone does not suffice).

Even if Soto did not qualify as Santana's supervisor, the Defendants are directly liable if they were negligent in preventing or correcting harassment they knew or should have known about. *In Breda v. Wolf Camera & Video*, 222 F.3d 886, 889–90 (11th Cir. 2000), we held that an employer is liable for co-worker harassment where it has either actual or constructive notice of the harassment and does not take remedial action. *Breda* also makes clear that actual notice is established when an employee reports harassment to someone with authority under the company's policy. *Id.* The Supreme Court's decision in *Vance* underscores the same point: when the alleged harasser is a co-worker rather than a supervisor, the employer's liability turns on whether it was negligent in controlling working conditions. 570 U.S. at 424. The record demonstrates that the Defendants had actual notice of Soto's conduct no later than April 2019, when Santana's counsel sent a detailed letter describing

the harassment before her return from medical leave. Yet, despite that notice, the Defendants permitted Soto to remain in authority over Santana when she returned. Santana's sworn statements that Soto continued to make physical contact and inappropriate remarks after her return—conduct the district court declined to consider because it deemed it retaliatory rather than sex-based—are critical to assessing employer negligence. Excluding those incidents from the analysis overlooked that they arose from the same pattern of sexually harassing conduct and occurred after the employer was already on notice of the problem.

Santana additionally argued that, in the alternative, the Defendants compounded their negligence by responding inadequately. A jury could reasonably reach this conclusion. Although the company opened an investigation, its investigator acknowledged that she had "no reason not to believe" Santana's account but nonetheless concluded that no harassment occurred. She simultaneously recommended that Soto be reassigned to another position, a step the company declined to take. The persistence of the harassment after this investigation supports a finding that the employer's response was neither immediate nor effective. *See Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1261 (11th Cir. 2003) ("If an employer has actual or constructive notice of harassment but takes immediate and appropriate corrective action, the employer is not liable for the harassment.").

On this record, a reasonable jury could find the Defendants liable under both theories. Soto and Roldan were supervisors, and

the company is therefore vicariously liable for their conduct. Even if they were not supervisors, the Defendants' explicit notice of ongoing harassment and failure to act effectively establishes direct liability. *See Miller*, 277 F.3d at 1275, 1278 (holding that an employer may be vicariously liable for a hostile work environment created by a supervisor, and that an employer may be directly liable if it knew or should have known of coworker harassment but failed to take prompt remedial action). The district court erred in concluding that no reasonable jury could hold the Defendants accountable for maintaining or permitting the hostile work environment Santana endured.

## IV. CONCLUSION

For these reasons, we **REVERSE** the district court's dismissal of Santana's retaliation claims, **REMAND** the grant of summary judgment on her hostile work environment claims, and **REMAND** the case for further proceedings.